**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 13 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NANCY E. HARBERT,

     Plaintiff - Appellee,

v.

HEALTHCARE SERVICES GROUP,
INC., a Pennsylvania corporation,

    Defendant - Appellant.

No. 03-1156

---

ELAINE CHAO, Secretary of Labor,

    Amicus Curiae.

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 00-K-908 (MJW))**

---

Jeffrey L. Braff, Cozen O'Connor, Philadelphia, Pennsylvania, for Defendant-
Appellant.

Clifford L. Beem, Clifford Beem & Associates, P.C., Denver, Colorado (A. Mark
Isley, Clifford Beem & Associates, P.C., Denver, Colorado, with him on the
brief), for Plaintiff-Appellee.

Roger Wilkinson, Attorney, United States Department of Labor, Washington, DC
(Howard M. Radzely, Solicitor of Labor, Steven J. Mandel, Associate Solicitor,
and Anne P. Fugett, Senior Attorney, United States Department of Labor,
Washington, DC, with him on the brief), for Amicus Curiae.

---

Before **EBEL**, **KELLY**, and **McCONNELL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Nancy Harbert ("Plaintiff") brought this action against her former employer, Healthcare Services Group, Inc. ("Defendant"), alleging that Defendant wrongfully denied her request for medical leave under the Family and Medical Leave Act ("FMLA"). Defendant had denied her request based on a provision of the FMLA which excludes from FMLA eligibility any employee who is employed at a particular "worksite" if the employer employs less than 50 employees within 75 miles of that worksite.

Applying a Department of Labor ("DOL") regulation, the district court defined Plaintiff's "worksite" as Defendant's regional office in Golden, Colorado. Because Defendant employed more than 50 employees within 75 miles of its Golden office, the district court denied Defendant's motion for summary judgment and, after a bench trial, found in Plaintiff's favor. Defendant filed this appeal, arguing that the relevant portion of the DOL regulation defining the statutory term "worksite" is invalid. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

Defendant contracts out housekeeping and laundry services to long-term care institutions. Defendant employs approximately 17,000 employees and has contracts with about 1,300 long-term care facilities in 42 states. Organizationally, Defendant is divided into regions, which are composed of multiple districts. Each district is made up of individual accounts, which are the long-term care institutions. Account managers work at the account to which they are assigned and report to district managers. District managers report to regional managers. In Colorado, all district managers and the regional manager have their offices at the same location in Golden, Colorado.

Sunset Manor is a convalescent/nursing facility located in Brush, Colorado, which is more than 75 miles from Golden. In 1994, Plaintiff was hired by Sunset Manor as the Housekeeper Supervisor, and in 1995 her responsibilities were expanded to include the position of Laundry Department Supervisor. In 1997, Defendant entered into an agreement to provide housekeeping and laundry services to Sunset Manor. Plaintiff's employment with Sunset Manor was transferred to Defendant, and Plaintiff became the account manager for Defendant's Sunset Manor account. Defendant assumed all responsibility for retaining, transferring, or firing Plaintiff and also paid her salary and provided her

benefits.  Plaintiff's duties, however, remained essentially the same as when she was employed directly by Sunset Manor.

Plaintiff worked out of an office at Sunset Manor in Brush.  When Plaintiff reported to her district manager, she reported to him at Defendant's regional office in Golden.  Such reports were almost always by telephone or through the submission of written reports; Plaintiff went to the Golden office only for an occasional district meeting of account managers.  Sunset Manor's administrator exercised supervision and control over Plaintiff when Plaintiff was employed by Sunset Manor, and this did not change after Plaintiff became an employee of Defendant.  Plaintiff believed that she had a long-term job at Sunset Manor and planned to work there until her retirement at age 65.

On November 6, 1998, Plaintiff injured her right hip in a non-work related automobile accident.  Plaintiff got permission from Defendant to take two 30-day periods of leave, and Plaintiff began the first 30-day period of leave on December 8, 1998.  On February 20, when Plaintiff failed to report to work after the expiration of the second 30-day period of leave, Defendant terminated Plaintiff's employment.

Although Defendant had granted Plaintiff two 30-day periods of leave, Defendant denied Plaintiff's request for leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*  The FMLA requires covered

employers to provide eligible employees with up to 12 weeks of medical leave per year for, inter alia, a serious health condition that renders the employee unable to work. Id. § 2612(a)(1)(D). Only those employees whose employer employs at least 50 employees within 75 miles of that employee's "worksite" are eligible for leave under the Act. Id. § 2611(2)(B)(ii). The statutory term "worksite" is defined in a DOL regulation. See 29 C.F.R. § 825.111(a)(3).

Defendant denied Plaintiff's request for FMLA leave based on Defendant's conclusion that Plaintiff was not employed at a "worksite" at which Defendant employed 50 or more employees within 75 miles, and that she was therefore ineligible for FMLA leave. This conclusion was based on the premise that Plaintiff's "worksite" was Sunset Manor in Brush, rather than Defendant's regional office in Golden. During the relevant time period, Defendant employed fewer than 50 employees within 75 miles of Sunset Manor but employed more than 50 employees within 75 miles of its regional office in Golden.

Plaintiff filed this lawsuit, alleging that Defendant wrongfully denied her request for medical leave under the FMLA and wrongfully terminated her. Defendant moved for summary judgment in part on the ground that the relevant portion of the DOL regulation defining the statutory term "worksite" was invalid. See Harbert v. Healthcare Servs. Group, Inc., 173 F. Supp. 2d 1101, 1106 (D.

Colo. 2001). The district court upheld the regulation and denied Defendant's motion for summary judgment. See id.

After a bench trial, the district court concluded that Plaintiff's "worksite" under the applicable regulation was Defendant's regional office in Golden, Colorado. Because Defendant employed more than 50 employees within 75 miles of its Golden office, the court held that Defendant wrongfully denied Plaintiff benefits under the FMLA. The district court awarded Plaintiff back pay, front pay, liquidated damages, interest, costs, and attorney fees.

In this appeal, Defendant concedes that the applicable DOL regulation identifies Plaintiff's "worksite" as its regional office in Golden. Defendant argues only that this regulation is invalid, contending that the agency exceeded its authority to implement the FMLA.

**DISCUSSION**

**I. Appellate Jurisdiction**

We first address whether we have jurisdiction to consider the merits of this appeal. On March 13, 2003, the district court entered an order resolving the issue of liability in Plaintiff's favor and setting forth a formula for the calculation of damages. The court instructed the parties to meet to determine the precise amount of damages and prepare a judgment in accordance with that determination. Defendant filed a notice of appeal on April 11. The district court later entered

judgment, fixing damages in the amount agreed upon by the parties and disposing of the case. No new notice of appeal was taken from the subsequent judgment. Defendant now wishes to appeal only the issue of liability resolved in the March 13 decision, not the subsequent calculation of damages.

Under 28 U.S.C. § 1291, we have jurisdiction only over "final" decisions of the district court. Albright v. UNUM Life Ins. Co. of Am., 59 F.3d 1089, 1092 (10th Cir. 1995). Accordingly, we must determine whether the March 13 Order – the only order from which a notice of appeal was taken – was a final decision and, if not, whether it became final when the district court subsequently fixed damages and disposed of the case.

### A.  Whether the March 13 Order was a "final" decision

For a ruling to be final, "it must end the litigation on the merits, and the judge must clearly declare his intention in this respect." FirsTier Mortgage Co. v. Investors Mortgage Ins. Co., 498 U.S. 269, 273-74 (1991) (internal quotations and citations omitted). A final order is one that "leave[s] nothing for the court to do but execute the judgment." Albright, 59 F.3d at 1092 (internal quotations omitted). As a general rule, "the touchstone of a final order is a decision by the court that a party shall recover only a *sum certain*." Id. (citing Fed. R. Civ. P. 58) (internal quotations omitted) (emphasis in original). Accordingly, an order

that determines liability but leaves damages to be calculated is not final. Id. However, pursuant to an exception to the general rule, "an order is final even if it does not reduce the damages to a sum certain if the order sufficiently disposes of the factual and legal issues and any unresolved issues are sufficiently ministerial that there would be no likelihood of further appeal." Id. at 1093 (quotations omitted).

For example, in Albright v. UNUM Life Insurance Co. of America, the plaintiff had requested in his motion for summary judgment the "monthly benefit of 66 2/3 % of his preinjury basic monthly earnings less other income benefits such as workers' compensation and Social Security Disability." Id. at 1092 (quotation omitted). The district court granted his motion but did not address the issue of benefits. Id. We stated that "both determining the correct amount of monthly benefits and the proper deductions for other income benefits may prove to be complicated and disputed calculations" and were not likely to be simply ministerial. Id. at 1093. Accordingly, we held that the district court's order was not final, and we dismissed the defendant's appeal. Id. at 1094.

In this case, the district court awarded Plaintiff back pay, front pay, liquidated damages, interest, costs, and attorney fees. Specifically, the district court set total back pay in the amount of $84,778.80, to be reduced by "the amount [Plaintiff] has earned [since her termination] through other employment

together with interest on the net amount at the legal rate." The district court set total front pay in the amount of $102,374.40, to be reduced by "the amount of compensation [Plaintiff] would earn from Conoco [until her 65th birthday], calculated at her present rate of earnings per week plus any guaranteed raises or cost of living increases."

The district court then ordered the parties "to meet and confer within[] 20 days from the date hereof to determine the precise amounts to be set forth in the judgment in accordance with the above stated findings and conclusions." The district further directed, "If counsel can agree, they shall prepare a judgment in accordance herewith. If counsel are unable to agree, they shall notify the court within the following ten days and the matters not agreed upon will be set for hearing."

The various components of the damages award were not sufficiently fixed to satisfy the standard we set forth in Albright. The amount of Plaintiff's past and future earnings was not determined, and calculation of those amounts could have proven complicated and disputed. For example, nothing in the order indicates whether Plaintiff's weekly compensation at Conoco is fixed or varies, and nothing in the order defines a "guaranteed" raise or cost of living increase. As such, the process of calculating damages in this case was no more "ministerial" than it was in Albright itself.

Moreover, the district court must have contemplated the possibility of a contentious process because it provided in its order that if the parties could not agree on the amount of the award, the disputed issues would be set for hearing. By so providing, the district court did not "clearly declar[e] his intention" to "end the litigation on the merits" in the March 13 Order. FirsTier, 498 U.S. at 273-74. For these reasons, we hold that the court's March 13 decision was not a final decision.

**B. Whether the March 13 Order became "final" when the district court disposed of the remainder of the case**

In Lewis v. B.F. Goodrich Co., we held that an otherwise nonfinal decision becomes final and appealable if the district court adjudicates all remaining claims against all remaining parties before the appellate court acts to dismiss the appeal on the merits for lack of jurisdiction. 850 F.2d 641, 645 (10th Cir. 1988) (en banc); see also Old Republic Ins. Co. v. Durango Air Serv., Inc., 283 F.3d 1222, 1225 (10th Cir. 2002); Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am., 935 F.2d 1152, 1154 n.1 (10th Cir. 1991); Fed. Sav. & Loan Ins. Corp. v. Huff, 851 F.2d 316, 317-18 (10th Cir. 1988) (en banc); Moore's Federal Practice, § 54.25[3], at 54-87 ("If an order is not certified under Rule 54(b), but a notice of appeal is nevertheless filed, any subsequent order of the district court that completely adjudicates the remaining claims is sufficient to validate the otherwise premature

- 10 -

notice of appeal."). Accordingly, a decision that is otherwise nonfinal because it leaves damages unresolved becomes final and appealable if post-appeal adjudications in the district court precisely fix damages and dispose of the case. Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 311 n.3 (3d Cir. 2001).

Here, subsequent to the notice of appeal, the district court entered a judgment fixing damages. All claims against all parties are now resolved. The district court's nonfinal decision therefore became final as a result of the post-appeal proceedings in the district court. We hold that the notice of appeal filed in this case was effective to confer appellate jurisdiction over the district court's March 13 Order. See Lewis, 850 F.2d at 645; Gen. Motors Corp., 263 F.3d at 311 n.3.

## II. Merits

Defendant challenges only the validity of 29 C.F.R. § 825.111(a)(3), the Department of Labor regulation defining the "worksite" of jointly-employed employees. Both parties agree that this joint employment provision, if valid, governs this case and that it would lead to a conclusion that Plaintiff was a covered employee. We review a district court's decision regarding the validity of an agency regulation *de novo*. See Pub. Lands Council v. Babbitt, 167 F.3d 1287, 1293 (10th Cir. 1999).

The framework we use to analyze an agency's construction of a statute it administers was set forth by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984). Chevron mandates a two-step inquiry. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. Because the judiciary is the final authority on issues of statutory construction, it "must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n.9. To ascertain whether Congress had an intent on the precise question at issue, courts should "employ[] traditional tools of statutory construction." Id. These tools include examination of the statute's text, structure, purpose, history, and relationship to other statutes. See Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 124 S. Ct. 1236, 1248-49 (2004).

Second,

[i]f...the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 843 (footnote omitted). The Court explained that an agency's answer is permissible unless arbitrary, capricious, or manifestly contrary to the statute:

> The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

Id. at 843-44 (internal quotations and citations omitted) (footnotes omitted).

### A. The Family and Medical Leave Act ("FMLA")

The FMLA was enacted, in part, "to balance the demands of the workplace with the needs of families...[and] to entitle employees to take reasonable leave for medical reasons...in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b). The Act entitles eligible employees of covered employers to take up to 12 weeks of unpaid, job-protected leave each year because of, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Id. § 2612(a)(1)(D).

As part of the balance that was struck between the interests of employers and the interests of employees, Congress included a small employer exception that excludes from the Act's coverage employers with fewer than 50 employees. Id. § 2611(4)(A)(i). A separate exception was granted for small operations – that is, a potentially large company with a relatively small satellite office in a particular area. Specifically, the statute excludes from coverage any employee whose employer employs less than 50 employees within 75 miles of that employee's "worksite" ("the 50/75 provision"). Id. § 2611(2)(B)(ii). According to the House Committee Report, the 50/75 provision "recognizes the difficulties an employer may have in reassigning workers to geographically separate facilities." H.R. Rep. No. 102-135(I), at 37 (1991).

With these eligibility restrictions, Congress recognized that only about 40 to 50 percent of all employees would be covered by the Act. S. Rep. No. 102-68, at 24 (1991); H.R. Rep. No. 102-135(I), at 37 (1991).

### B. The FMLA regulation defining "worksite"

Congress granted the Secretary of Labor the authority to prescribe such regulations as are necessary to carry out the FMLA. 29 U.S.C. § 2654. The regulation at issue in this case, 29 C.F.R. § 825.111(a)(3), defines the "worksite" of an employee who is jointly employed by two or more employers as follows:

> For purposes of determining that employee's eligibility, when an employee is jointly employed by two or more employers (see § 825.106), the employee's worksite is the primary employer's office from which the employee is assigned or reports. The employee is also counted by the secondary employer to determine eligibility for the secondary employer's full-time or permanent employees.

Id. § 825.111(a)(3). Section 825.106(a) states that two entities may be considered "joint employers" where they both exercise some control over the work or working conditions of the employee. Id. § 825.106(a). For example, joint employment will ordinarily be found to exist when a temporary agency supplies employees to a second employer. Id. § 825.106(b). In joint employment relationships, the "primary employer" is the only employer responsible for providing FMLA leave. Id. § 825.106(c). The "primary employer" is determined by considering such factors as the authority to hire and fire, assign/place the employee, make payroll, and provide employment benefits. Id.

In this case, the district court identified Plaintiff as jointly employed by both Defendant and Sunset Manor, applied § 825.111(a)(3), and defined Defendant as Plaintiff's "primary employer." None of this is at issue in this appeal. What is at issue is whether § 825.111(a)(3) is a valid regulation implementing the FMLA.

- 15 -

## C. The *Chevron* analysis

Pursuant to Chevron's mandate, we must first consider whether Congress expressed a clear intent with respect to the meaning of "worksite" for an employee who is jointly employed. See 467 U.S. at 842-43. We conclude that congressional intent with respect to this issue is not sufficiently clear to render the regulation invalid under the first step of Chevron.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979); CBC, Inc. v. Bd. of Governors of the Fed. Reserve Sys., 855 F.2d 688, 690 (10th Cir. 1988). Congress did not define the term "worksite" in the FMLA. However, the common understanding of the term "worksite" is the site where the employee works. Here, the parties do not dispute that Plaintiff worked at Sunset Manor in Brush, Colorado. Under the ordinary meaning of the term, her "worksite" would be Sunset Manor in Brush. However, under the joint employment regulation, § 825.111(a)(3), Plaintiff's "worksite" is Defendant's regional office in Golden, a place where Plaintiff went only for occasional meetings of account managers. Nonetheless, Congress did not expressly define the term "worksite" in the FMLA, and because Congress has not directly spoken to the question at issue, we proceed to a step-two analysis under Chevron.

Under the second step of <u>Chevron</u>, we must "give[] controlling weight [to the agency's regulations] unless they are arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844. In light of the deference we owe an agency's construction of the statute, this case presents a very close question. However, we conclude that § 825.111(a)(3), as applied to the situation of an employee with a fixed place of work, is arbitrary, capricious, and manifestly contrary to the FMLA. We first address the three indicia of congressional intent that lead us to this conclusion, and then consider the counter-arguments made by Plaintiff and the Secretary of Labor.

### 1. Common meaning of the term "worksite"

We concluded above that the agency's definition of "worksite," as applied to Plaintiff, runs contrary to the common meaning of that term. <u>See</u> discussion <u>supra</u>. That the agency's definition of Plaintiff's worksite contravenes the plain meaning of the term "worksite" is one indicia of congressional intent that militates against deference to the agency's construction of the statute under the second step of <u>Chevron</u>.

### 2. Legislative Purpose

"Courts must guard against interpretations that might defeat a statute's purpose[.]" <u>United States v. Soto-Ornelas</u>, 312 F.3d 1167, 1172 (10th Cir. 2002)

- 17 -

(quotations and alterations omitted). The agency's definition of worksite, as applied to Plaintiff, is contrary to the purpose underlying the 50/75 provision.

As discussed above, Congress included a provision in the FMLA excluding from the Act's coverage employers with fewer than 50 employees. 29 U.S.C. § 2611(4)(A)(i). However, Congress also recognized that even potentially large employers (i.e., those with more than 50 employees) may have difficulty finding temporary replacements for employees who work at geographically scattered locations. Congress therefore determined that if any employer (large or small) has no significant pool of employees *nearby* to cover for an absent employee, that employer should not be required to provide FMLA leave to that employee. Specifically, Congress determined that an employer must employ at least 50 employees *within 75 miles* of the employee's worksite. Id. § 2611(2)(B)(ii).

The House Report confirms that the congressional purpose underlying the 50/75 provision was to remove the burden of providing FMLA leave from employers who do not have an abundant supply of temporary replacements in close geographic proximity to the employee requesting leave:

> For purposes of determining the size of an employer, there is a geographic limitation of a 75-mile radius that applies to the aggregation of employees at different facilities. This provision recognizes the difficulties an employer may have in reassigning workers to geographically separate facilities.

H.R. Rep. No. 102-135(I), at 37 (1991).

An employer's ability to replace a particular employee during his or her period of leave will depend on where that employee must perform his or her work. In general, therefore, the congressional purpose underlying the 50/75 provision is not effected if the "worksite" of an employee who has a regular place of work is defined as any site other than that place.[1]

For example, if Defendant were to grant leave to Plaintiff, Defendant would have been required to find an employee to cover for Plaintiff at Sunset Manor in Brush, Colorado. It is undisputed that Defendant employed fewer than 50 employees within 75 miles of Brush. Defendant therefore had no abundant supply of employees who could have covered for Plaintiff during her period of leave. Defendant, a large employer with geographically dispersed employees, is precisely the type of employer Congress intended to protect with its enactment of the 50/75 provision.

Accordingly, a regulatory provision that defines Plaintiff's "worksite" as Defendant's regional office in Golden does not effect the congressional purpose underlying the 50/75 provision.

---

[1]We do not intend this statement to cast doubt on the portion of the agency's regulation defining the "worksite" of employees whose regular workplace is his or her home. See 29 C.F.R. § 825.111(a)(2).

### *3. Arbitrary distinction between sole and joint employers*

The challenged regulation also creates an arbitrary distinction between sole employers and joint employers. For example, if the employer is a company that operates a chain of convenience stores, the "worksite" of an employee hired to work at one of those convenience stores is that particular convenience store. See 58 Fed. Reg. 31794, 31798 (1993). If, on the other hand, the employer is a placement company that hires certain specialized employees to work at convenience stores owned by another entity (and therefore is considered a joint employer), the "worksite" of that same employee hired to work at that same convenience store is the office of the placement company. See 29 C.F.R. § 825.111(a)(3).

Assuming both employers employ more than 50 employees within 75 miles of their central office but fewer than 50 employees within 75 miles of the convenience store, the employee is *ineligible* for FMLA leave if the employer is a sole employer (e.g., the company that owns the convenience store chain) but *eligible* for FMLA leave if the employer is a joint employer (e.g., the placement company).

Accordingly, the joint employment provision creates the possibility that an employer's responsibility to provide FMLA leave to an employee will depend *exclusively* on whether that employer is a sole employer or a joint employer. This

is true despite the fact that neither employer has an abundant supply of nearby employees to replace temporarily an employee taking leave and, consequently, are both subject to the burden Congress tried to alleviate by enacting the 50/75 provision. See discussion supra Section II.C.2. The effect of the joint employment provision is to require the joint employer to bear that burden even though the sole employer is relieved of that burden. Because both types of employers bear the burden the 50/75 provision was designed to alleviate, there is simply no basis in the statute or in logic for such a distinction.[2] We owe no deference to an agency's arbitrary construction of a statute. See Chevron, 467 U.S. at 844.

In sum, the ordinary meaning of the term "worksite," the congressional purpose underlying the 50/75 provision, and the arbitrary distinction the regulation creates between sole and joint employers all militate strongly against deference to the agency's construction of the statute as applied to Plaintiff. At bottom, Congress intended the term "worksite" to be construed as the employee's

---

[2]The Secretary insists that the distinction between sole employers and joint employers is not arbitrary because the agency could reasonably have concluded that joint employers are better equipped to find replacements for remotely-stationed employees. We disagree. While some joint employers may have employees who are willing to change job locations regularly (e.g., temporary employees), there is no reason to believe that these employees are any more likely than any other employee to do so if changing job locations requires moving to a new location more than 75 miles away.

- 21 -

regular place of work, and we see no reason to apply a different definition to Plaintiff simply because she is jointly-employed. We turn next to the counter-arguments offered by the Secretary and Plaintiff.

### 4. Counter-arguments

#### a. The legislative history's reference to the WARN Act

The Secretary insists that the joint employment provision is valid because the agency, as directed by the legislative history, patterned the definition of "worksite" after the definition of "single site of employment" in the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 *et seq.*

The Secretary correctly points out that the House and Senate Committee Reports both indicate that the term "worksite" is to be construed consistent with the term "single site of employment" under the WARN Act and regulations under that Act:

> The term "worksite" is intended to be construed in the same manner as the term "single site of employment" under the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. 2101(a)(3)(B), and regulations under that Act (20 CFR Part 639). Where employees have no fixed worksite, as is the case for many construction workers, transportation workers, and salespersons, such employees' "worksite" should be construed to mean the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report.

S. Rep. No. 103-3, at 23 (1993); see also H.R. Rep. No. 103-8(I), at 35 (1993) (substantially the same).

The WARN Act requires covered employers to provide written notice to affected employees sixty days before a "mass layoff."  29 U.S.C. § 2102(a); <u>see also</u> <u>Frymire v. Ampex Corp.</u>, 61 F.3d 757, 761 (10th Cir. 1995).  Congress defined "mass layoff" as "a reduction in force which...results in an employment loss at the *single site of employment* during any 30-day period for...at least 50 employees[.]"  29 U.S.C. § 2101(a)(3) (emphasis added).  The WARN Act itself does not define "single site of employment."

The Secretary of Labor has promulgated a regulation defining the term "single site of employment" for purposes of the WARN Act.[3]  20 C.F.R. § 639.3(i); <u>see also</u> 29 U.S.C. § 2107.  The focus of the regulation is in explaining when two or more different employment sites can be counted together as a "single site" for the purpose of aggregating employees to reach the 50-employee minimum.  <u>See</u> 20 C.F.R. § 639.3(i).  The regulation also recognizes that the employment sites of certain groups of employees will be difficult to identify. Accordingly, it provides:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is

---

[3]This regulation was promulgated in 1989 (<u>see</u> 54 Fed. Reg. 16042 (1989))**,** prior to enactment of the FMLA.

assigned, or to which they report will be the single site in which they are covered for WARN purposes.

Id. § 639.3(i)(6).

The Secretary argues that its FMLA joint employment regulation, 29 C.F.R. § 825.111(a)(3), is consistent with this WARN regulation defining "single site of employment" for purposes of the WARN Act. Specifically, the Secretary argues that jointly-employed employees are essentially "outstationed" workers and are properly treated in the joint employment provision of the FMLA in the same manner that outstationed workers are treated under this WARN Act regulation. For several reasons, we disagree.

First, we believe that this provision of the WARN Act governs only employees without a fixed place of work, not employees who, like Plaintiff, do have a fixed place of work. All three examples listed in the parenthetical in the WARN Act regulation are employees who do not have a fixed place of work. See 20 C.F.R. 639.3(i)(6) (listing railroad workers, bus drivers, and salespersons). Furthermore, the agency, in enacting the WARN Act regulation, referred to § 639.3(i)(6) as "that part of the regulation relating to mobile workers[.]" 54 Fed. Reg. 16042, 16051 (1989).[4] Finally, for employees who do have a fixed place of

_____

[4]The passage provides in full:

Another commenter suggested that in the railroad industry certain

(continued...)

- 24 -

work, there is no reason to believe the agency for purposes of the WARN Act would have named any different place as the employee's employment site. Accordingly, we conclude that the applicable WARN Act regulation, 20 C.F.R. § 639.3(i)(6), applies only to employees without a fixed place of work and is not relevant to employees who, like Plaintiff, do have a fixed place of work.

Further, even if the term "outstationed" in the WARN Act regulation could reasonably be interpreted more broadly to encompass employees who do have a fixed place of work, the definition of "single site of employment" for outstationed employees under the WARN Act is ambiguous. Under the WARN Act regulation, there are three potentially different locations that could be the "single site of

---

[4](...continued)
maintenance crews have no home base and should be treated as separate operating units. While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of employment to which they are assigned. These workers may not have an assigned home base, but they must get their orders or assignments from somewhere, even if that place changes from time to time. In order to cover this situation and the situation of outstationed workers and traveling workers who report to but do not work out of a particular office, that part of the regulation relating to *mobile workers* has been revised to clarify that such workers should be treated as assigned to their home base or to the single site from which their work is assigned or to which they report. This part of the definition has been moved, for reasons of organizational clarity, to be a part of the definition of "single site of employment" in § 639.3(i).

54 Fed. Reg. at 16051 (emphasis added).

employment" of an outstationed employee – namely, "the site...to which they are assigned as their home base, from which their work is assigned, or to which they report." 20 C.F.R. § 639.3(i)(6). Accordingly, even if Plaintiff, who does have a fixed place of work, could be considered "outstationed" under the WARN Act regulation, it is entirely unclear from the regulation whether her "single site of employment" would be Brush (the site to which she is assigned) or Golden (the place to which she reports and from which she is assigned). As such, the WARN Act regulation provides little, if any, guidance to the agency with respect to the proper definition of "worksite" for an employee who, although arguably "outstationed," does have a fixed place of work.

Absent guidance from Congress, such ambiguity might militate in favor of deference to the agency's construction of the statute. As discussed above, however, the plain meaning of the term "worksite" in the FMLA, the congressional purpose underlying the 50/75 provision in the FMLA, and the arbitrary distinction the regulation creates between sole and joint employers under the FMLA are all factors that militate strongly against deference to the agency's construction of that statute. We therefore find no merit in the Secretary's argument that an ambiguous regulation implementing the WARN Act renders the agency's construction of the FMLA reasonable.

***b. Congressional recognition that the "worksite" of some
employees may not be their regular workplace***

The Secretary also argues that because the legislative history suggests that the "worksite" of some employees may be some place other than their regular place of work, it was permissible for the agency to define the "worksite" of jointly-employed employees as some other location. We disagree.

The House and Senate Committee Reports both provide a definition of "worksite" for employees with "no fixed worksite." Specifically:

> Where employees have no fixed worksite, as is the case for many construction workers, transportation workers, and salespersons, such employees' "worksite" should be construed to mean the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report.

S. Rep. No. 103-3, at 23 (1993); see also H.R. Rep. No. 103-8(I), at 35 (1993) (substantially the same). As such, both Committee Reports recognized that all employees, even those without a fixed worksite, must have a definable "worksite" so that their eligibility under the Act can be determined. For employees without a fixed worksite, it was necessary to identify some fixed location that could serve as a "worksite" for purposes of the Act. See, e.g., S. Rep. No. 103-3, at 23. That location could not be the employee's regular workplace, because the employee has no regular workplace. Accordingly, we do not question the validity of the agency's regulation pertaining to employees with "no fixed worksite." See 29 C.F.R. § 825.111(a)(2).

- 27 -

Furthermore, we do not question the validity of the joint employment provision, id. § 825.111(a)(3), insofar as it applies to employees of temporary help agencies. An employee of a temporary help agency does not have a permanent, fixed worksite. It is therefore appropriate that the joint employment provision defines the "worksite" of a temporary employee as the temporary help office, rather than the various changing locations at which the temporary employee performs his or her work. See 60 Fed. Reg. 2180, 2187 (1995) (explaining that under joint employment provision, "worksite" of temporary employee is temporary help office).

On the contrary, if an employee *does* have a fixed worksite, there is no similar need to identify a constructive "worksite" for purposes of the FMLA. The Secretary's argument that an employee with a fixed worksite should be treated comparably to an employee without a fixed worksite is therefore without merit.

In sum, we find the counter-arguments offered by Plaintiff and the Secretary unavailing, and we conclude that 29 C.F.R. § 825.111(a)(3), as applied to an employee like Plaintiff with a fixed worksite yet subject to joint employers, is arbitrary, capricious, and manifestly contrary to the FMLA.[5]

---

[5]We also note that we find no merit in Plaintiff's argument that congressional silence since the Secretary promulgated the regulation militates in favor of the regulation's validity. Plaintiff relies primarily on Walker v. United Parcel Service, Inc., 240 F.3d 1268 (10th Cir. 2001). In Walker, Congress had

(continued...)

# CONCLUSION

We appreciate the deference we owe to an agency's construction of the statute it is charged with administering when the agency's construction is not contrary to the clearly expressed intent of Congress. As the Supreme Court recently recognized, however, "[o]ur deference to the Secretary...has important limits: A regulation cannot stand if it is arbitrary, capricious, or manifestly contrary to the statute." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 87 (2002) (quotation omitted) (invalidating different FMLA regulation under second step of Chevron). We hold that 29 C.F.R. § 825.111(a)(3), as applied in this case to a jointly employed employee with a fixed worksite, is not a valid exercise of agency authority, and we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

---

[5](...continued) amended Title VII without taking issue with the agency regulation in question, even though the validity of the regulation had been the subject of debate within the courts. Id. at 1276. We held that congressional silence under these circumstances lent support to a conclusion that the regulation is valid, emphasizing that "[p]lainly EEOC's regulation has not escaped public or legislative notice over what has been nearly a quarter century." Id. Here, the subject regulation had not been the subject of debate until this case.

03-1156, Nancy E. Harbert v. Healthcare Services, Inc.
**KELLY**, Circuit Judge, concurring in part and dissenting in part.

While I concur in the court's conclusion that we have appellate jurisdiction, I dissent from its holding that 29 C.F.R. § 825.111(a)(3) defining the statutory term "worksite" is invalid, as applied to a jointly employed employee with a largely fixed worksite. Declaring invalid a regulation that an agency has been charged with developing is strong medicine and only appropriate when the regulation is "arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 844 (1984). Here, the statute never defines "worksite" and the Secretary of Labor is empowered to prescribe rules to implement the FMLA. 29 U.S.C. § 2654. We must defer to the agency's interpretation if it "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843.

The court invalidates the regulation as applied to jointly employed employees with largely fixed worksites as inconsistent with the purpose of the 50/75 provision. Healthcare does not appeal the district court's decision that Ms. Harbert was jointly employed, but instead contends that the "worksite" definition is invalid. Aplt. Br. at 9-10. The 50/75 provision excludes an employee from FMLA coverage if the employee "is employed at a worksite at which [the] employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii).

Joint employment comes in many forms.  But the primary employer generally has control over the reassignment, placement, and hiring and firing of joint employees, not the secondary employer.  See 29 C.F.R. § 825.106(c).  Thus, an employee's "worksite" is defined with reference to the employer retaining the most control over the employee, and the employer responsible for providing FMLA leave.  Id.  The court's ipse dixit that the Secretary's definition of the term "worksite" is contrary to common meaning fails to account for the many variations in joint employment relationships, from forever fixed to forever mobile.  See Moreau v. Air Fr., 356 F.3d 942, 946 (9th Cir. 2004); 29 C.F.R. 825.106.

The legislative history reflects that the Senate and House obviously were aware of variations in joint employment relationships and directed the Secretary to construe "worksite" in the same manner as the term "single site of employment" under the WARN Act.  S.R. Doc. No. 103-3, at 25 (1993); see also H.R. Doc. No. 103-8, pt. 1, at 35 (1993).  Though both the legislative history and a WARN Act regulation, 20 C.F.R. § 639.3(i), discuss workers that lack a fixed site of employment, the Secretary's interpretation that other arrangements are encompassed within the directive to the WARN Act is a permissible and reasonable interpretation.  Holding that the WARN Act regulation only applies to employees without a regularly fixed site of employment would seem to contravene

the express language of the provision which mentions other categories, including employees who "travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites." Id.

The court's contrast between sole and joint employers (a convenience store chain and a temporary placement agency) as an example resulting in arbitrary differences in treatment is hardly persuasive. Ct. Op. at 20; but see id. at 28. The court contends that these two employers would be treated differently even though neither has abundant replacements nearby. Unlike the court, I find this distinction favors the validity of the regulation. Basing FMLA eligibility on primary employers prevents confusion and provides certainty, because a temporary placement employee's coverage could vary daily were he placed in different convenience stores on a rotating basis. Further, contrary to the court's assertion, the ability of a convenience store and a placement agency to find abundant nearby replacements probably is not identical, after all, the placement agency specializes in hiring and placing employees within the area.

Though the regulation might be more precise were we crafting it, that is not our function. It is a permissible exercise of agency rulemaking. I respectfully dissent.