**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KIM HACKWELL and KILLIAN,
GUTHRO & JENSON, P.C.,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF JUSTICE;
ALBERTO GONZALES, Attorney
General; and TIMOTHY GARREN,
Director, Torts Branch, Civil Division,
AND HIS SUCCESSORS IN OFFICE.

      Defendants-Appellees.

No. 05-1509

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 04-cv-00827-EWN-CBS)**

---

Jeffrey Robert White of Center for Constitutional Litigation, P.C., Washington D.C. (J.
Keith Killian and Damon J. Davis of Killian, Guthro & Jensen, P.C., Grand Junction,
Colorado, with him on the briefs) for Plaintiffs-Appellants.

Elizabeth Goitein (Peter D. Keisler and Mark B. Stern, with her on the brief), United
States Department of Justice, Civil Division, Washington, D.C., for Defendants-
Appellees.

---

Before **BRISCOE**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

Plaintiffs-Appellants Kim Hackwell and Killian, Guthro & Jensen, P.C. (KGJ) filed a complaint in the United States District Court for the District of Colorado challenging a regulation, 28 C.F.R. § 79.74(b), that interprets the attorney-fee limitations set forth by the Radiation Exposure Compensation Act, 42 U.S.C. § 2210 note Sec. 9. The district court granted the Defendants' motion to dismiss for failure to state a claim. Dist. Ct. Order at 24.  See Fed. R. Civ. P. 12(b)(6).  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **reverse** and **remand** for proceedings consistent with this opinion.

## I.  BACKGROUND

On October 15, 1990, Congress enacted the Radiation Exposure Compensation Act (RECA) to remedy the injustice suffered by those exposed to radiation created by the government's atomic-weapons testing during the Cold War.  This Act limited the fee a RECA claimant's attorney could collect: "Notwithstanding any contract, the representative of an individual may not receive, for services rendered in connection with the claim of an individual under this Act, more than 10 per centum of a payment made under this Act on such claim."  Pub. L. No. 101-426, § 9 (1990).

On July 10, 2000, Congress amended this Act in several ways—one of which was to reduce attorney fees in certain circumstances:

> (a) General Rule.  Notwithstanding any contract, the representative of an individual may not receive, for *services rendered* in connection with the claim of an individual under this Act, more than that percentage specified in subsection

-2-

(b) of a payment made under this Act on such claim.
(b) Applicable percentage limitations.  The percentage referred to in subsection (a) is –
        (1) 2 percent for the filing of an initial claim; and
        (2) 10 percent with respect to –
                (A) any claim with respect to which a representative has made a *contract for services* before the date of the enactment of the Radiation Exposure Compensation Act Amendments of 2000 . . . ; or
                (B) a resubmission of a denied claim.
(c) Penalty.  Any such representative who violates this section shall be fined not more than $5,000.

42 U.S.C. § 2210 note Sec. 9 (emphasis added).

On March 23, 2004, in accordance with his authority to "issue such regulations as are necessary to carry out this Act," id. § 2210 note Sec. 6(j), the Attorney General promulgated a regulation interpreting the phrase "services rendered" to include "costs incurred":

> (b) Fees.
> (1) Notwithstanding any contract, the attorney of a claimant or beneficiary, along with any assistants or experts retained by the attorney on behalf of the claimant or beneficiary, may not receive from a claimant or beneficiary any fee *for services rendered, including costs incurred*, in connection with an unsuccessful claim.
> (2) Notwithstanding any contract and except as provided in paragraph (b)(3) of this section, the attorney of a claimant or beneficiary, along with any assistants or experts retained by the attorney on behalf of the claimant or beneficiary, may receive from a claimant or beneficiary no more than 2% of the total award *for all services rendered, including costs incurred*, in connection with a successful claim.
> (3)(I) If an attorney entered into a contract with the claimant or beneficiary for services before July 10, 2000, with respect to a particular claim, then that attorney may

receive up to 10% of the total award *for services rendered, including costs incurred*, in connection with a successful claim.
(ii) If an attorney resubmits a previously denied claim, then that attorney may receive up to 10% of the total award to the claimant or beneficiary *for services rendered, including costs incurred*, in connection with that subsequently successful claim. Resubmission of a previously denied claim includes only those claims that were previously denied and refiled under the Act.
(4) Any violation of paragraph (b) of this section shall result in a fine of not more than $5,000.

28 C.F.R. § 79.74(b) (emphasis added).

Plaintiff Kim Hackwell is the daughter of a deceased uranium worker who qualifies to receive a payment under the RECA. Ms. Hackwell attempted to hire KGJ, a law firm that represents RECA claimants, to assist her in filing her RECA claim. But KGJ decided not to represent Ms. Hackwell, allegedly because 28 C.F.R. § 79.74(b)'s fee limitation applies to the sum of the attorneys' expenses and fee, and KGJ could not afford to represent Ms. Hackwell under this scheme.

Subsequently, KGJ and Ms. Hackwell filed a complaint challenging the regulation on several grounds. See infra n.1. The district court, applying Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), held that the Attorney General's interpretation of the RECA's attorney-fee limitation is reasonable and consistent with Congress's intent. Specifically, the district court concluded that combining costs incurred with payments for services rendered when calculating the limit on an attorney's fee is consistent with the RECA's purpose to benefit radiation-exposure victims. Indeed, the

court reasoned, one section in the RECA forbids the Attorney General from collecting costs incurred in carrying out the Act. The court also noted that several fee-shifting statutes, such as § 1988 of the Civil Rights Act, use the phrase "attorney fee" to include expenses as well as fees.

The district court therefore deferred to the Defendants' regulation, found that the regulation is consistent with the RECA, and granted the Defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss. Ms. Hackwell and KGJ filed this timely appeal.

## II. DISCUSSION

The Plaintiffs assert that the district court erred in several respects,[1] yet our resolution of the first alleged error moots the remaining issues presented. The Plaintiffs argue that the district court should have set aside 28 C.F.R. § 79.74(b) as inconsistent with Congress's unambiguous intent and 42 U.S.C. § 2210 note Sec. 9. The Government rejoins that 28 C.F.R. § 79.74(b) is entitled to deference because "[t]he mere fact that a fee limitation may be construed by a court or an agency to exclude attorneys' expenses does not suggest that this is the *only* plausible construction," Aplee. Br. at 24 (emphasis in original), and because the regulation is consistent with both the text and purpose of the

---

[1]The Plaintiffs assert that the district court erred by dismissing their six causes of action: (1) the regulation is invalid because it is inconsistent with the RECA; (2) the regulation exceeds the authority that the RECA delegated to the Department of Justice; (3) the regulation violates the Fifth Amendment Due Process Clause by impairing vested rights; (4) the regulation violates the Fifth Amendment Takings Clause by impairing vested rights; (5) the regulation infringes upon RECA claimants' right to access the courts; and (6) the regulation violates the Tenth Amendment because it is inconsistent with the Colorado Rules of Professional Conduct.

RECA's attorney-fee limitation.

Neither party has identified, nor have we found, a federal-court decision addressing the issue presented. We hold that the regulation is contrary to the RECA's plain language and is therefore invalid.

## A. Standard of Review

The legal sufficiency of a complaint is a question of law. Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). So we review de novo a district court's dismissal for failure to state a claim. A motion to dismiss for failure to state a claim "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976).

## B. The Validity of 28 C.F.R. § 79.74(b)

The Supreme Court in Chevron articulated a two-step test for analyzing an agency's construction of the statute it administers:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue . . ., the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

Chevron, 467 U.S. at 842-44.

We determine whether Congress had an intent on the question at issue by

"employing traditional tools of statutory construction," id. at 843 n.9, "includ[ing] examination of the statute's text, structure, purpose, history, and relationship to other statutes." Harbert v. Healthcare Services Group, Inc., 391 F.3d 1140, 1147 (10th Cir. 2004).

### 1. **Chevron Step One**

### a. **The Text of 42 U.S.C. § 2210 note Sec. 9**

Following the Supreme Court and Harbert's prescription to examine the statute's language, purpose, history, and relationship to other statutes, we find that the distinction between compensation for "services rendered" and "expenses" is clearly demarcated by common meaning and several federal statutes.

The Random House Dictionary of the English Language 1750 (2d ed. 1987) defines "service" as "an act of helpful activity; help; aid: to do someone a service" and defines its inflection, "services," as "the performance of any duties or work for another." On the contrary, "expense" is defined as a "cost or charge," and its inflection, "expenses," is defined as "charges incurred during a business assignment or trip[,] . . . money paid as reimbursement for such charges: to receive a salary and expenses." Random House Dictionary at 680.

So compensating an attorney for providing legal advice—a service—is distinguishable in meaning from reimbursing an attorney who has incurred a charge for requesting a copy of a document. Indeed, "salary and expenses" would be surplusage if these words were synonyms.

-7-

Clearly making this distinction in usage, for example, the bankruptcy court in In Re Bicoastal Corp. first rejected a litigant's request for fees for services rendered, and then, "because the description of expenses incurred . . . [was] equally vague and nonspecific," the court separately denied the litigant's request for expenses. 118 B.R. 855, 859 (Bankr. M.D. Fla. 1990). Similarly, the court in In re Three Mile Island Litigation relied on a Third Circuit holding when explaining that "LEXIS charges are a reimbursable *expense*[,] . . . not attorneys' hours," clearly making a distinction between calculating reimbursable expenses and evaluating the hours and services that formed the basis for the attorneys' fees for services. 557 F.Supp. 96, 109 (D.C. Pa. 1982) (emphasis in original). Further illuminating this distinction, the court excluded any reference to expenses when the court stated that it had asked the plaintiff to submit evidence of "each document filed, each deposition involving participation by counsel for plaintiff, each conference attended, [and] each court hearing . . ." before it would evaluate the attorneys' claimed hours and the nature of the services performed. Id. at 108.

Applying these definitions to the RECA supports the Plaintiffs' position. An attorney representing a RECA claimant will provide several services, including filling out the required forms, searching for particular documents, and providing the client with information about the claims process. An attorney who completes these actions has performed duties for his or her client. One could not plausibly suggest that, for example,

filling out or searching for a document to support the client's claim is an expense.[2]  This

is the service for which the attorney was hired.  Equally true according to common usage

is that an attorney incurs an expense when charged a fee for photocopying a document.

We cannot agree as a matter of plain meaning that when an attorney incurs such an

expense and seeks reimbursement from the client, this reimbursement constitutes

compensation for "services rendered."  Treating the client's reimbursement of the

attorney's expenses as the equivalent of compensating the attorney for services rendered,

at least in this context, would deny these words their ordinary meaning.

The dissent finds this English lesson unpersuasive because the service being

rendered might be the completion of a RECA application, which could involve procuring

medical reports or other documents.  Dissent, infra, at 2.  So "[w]hen a client

subsequently repays an attorney for the expenses incurred in procuring this supporting

---

[2]The dissent concludes that "[w]hile the majority doubts whether RECA's 'services rendered' language can be plausibly interpreted to include expenses incurred in obtaining necessary documentation, its skepticism rests mainly on its interpretation of the term 'service' as excluding expenses incurred in obtaining necessary documentation, and that a contrary interpretation of the term 'service' will have negative policy consequences."  Dissent, infra, at 2.

Indeed, we do conclude that although taking the time to obtain documentation, fill out documents, and advise the client are services under any definition of the term, reimbursing an attorney the money that he or she paid to an expert for an expert medical opinion, for example, would reimburse the attorney for an expense, not pay for a service rendered.  We base this conclusion not on general policy concerns, however, (even though the challenged regulation would create consequences that Congress and even the Defendants sought to avoid), but on the several sources that we cite throughout this opinion to show that these terms have plainly distinct meanings.  The dissent rejects this conclusion by merely saying—without providing substantive reasons or authority—that paying for a service might be the same thing as paying for an expense.

-9-

documentation, [she reasons,] . . . the attorney has received a payment for the service rendered of compiling that documentation." Id. This conclusion apparently derives, at least partly, from the premise that expending money to procure the necessary supporting documentation is an "inseparable" and "necessary" component of the service rendered. Id.

There are at least two problems with this analysis. Applying the meanings of "expenses" and "services," meanings we derive from the dictionary, common usage, treatises on attorney fees, legal history, other statutes, and the function of this Act, we conclude that reimbursing an attorney for an expense (e.g., the charge an attorney incurs when making a photocopy) means something different from paying an attorney for his or her services (e.g., taking the time to decide what needs to be photocopied and taking the time to photocopy). So the first problem with the dissent's analysis is that the dissent's example provides no substantive support for the idea that the client pays the attorney for a service when the client reimburses the attorney for an expense, other than offering the idea that incurring expenses is an inseparable and necessary part of providing the service. But this raises a second problem: expending money toward an expense will almost *always* be inseparable from and necessary to provide the service. As we explain later, tort attorneys who decide to forgo a medical opinion of their injured clients to prove the clients' injuries and damages, and, likewise, social-security attorneys who refuse to expend money to receive a doctor or occupational expert's opinion about their clients' residual functional capacities, will almost certainly find themselves delivering low-quality

(if not negligent) legal services. Put otherwise, incurring expenses is virtually *always* necessary to provide a service. The dissent errs by relying on this temporal claim (i.e., when you find services, you will usually find expenses)—which is derived from the Attorney General's observation that obtaining and submitting necessary documentation largely describes a RECA attorney's services—to transform these distinct words into one. The mere fact that one (i.e., incurring expenses) is the precondition of the other (i.e., performing a service), however, does not merge their meanings. Maybe they are inseparable in fact—you might not find one without the other—but this is true of several concepts that we understand as distinct.

While there is no *per se* rule of statutory interpretation that identical words used in different statutes are intended to have the same meaning, we will nevertheless look at a statute's "relationship to other statutes" to determine Congress's intent. Harbert, 391 F.3d at 1147. Like the dissent, we understand that a dictionary definition, *standing alone*, is not necessarily dispositive. See dissent, infra, at 4. Here, however, the distinction in meaning between compensation for "services rendered" and "expenses" is further exemplified by several federal statutes.

Under 11 U.S.C. § 330(a)(1)(A), which pertains to bankruptcy filings, "the court may award . . . reasonable compensation for actual, necessary services rendered by the trustee . . . or attorney." Separate from this provision, the statute provides that the "court may award . . . reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(B). Section 503, *inter alia*, of this title similarly distinguishes between "services rendered"

and "expenses," stating that certain parties may recover "reasonable compensation for professional services rendered by an attorney . . . *and* reimbursement for actual, necessary expenses incurred by such attorney . . . ."  11 U.S.C. § 503(b)(4) (emphasis added). E.g.,11 U.S.C. § 543(c)(2) (stating that "[t]he court, after notice and a hearing, shall . . . provide for the payment of reasonable compensation for services rendered *and* costs and expenses incurred by such custodian . . .") (emphasis added).

In 15 U.S.C. § 80a-26(f)(2)(A), Congress again distinguished "services rendered" from "expenses": "[it is unlawful for certain parties to sell certain insurance contracts] unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company . . . ."  Similarly, 18 U.S.C. § 3006A(d)(5) closely tracks this language when it distinguishes between services and expenses, providing that when an attorney files a claim for compensation and reimbursement, "[e]ach claim shall be supported by a sworn written statement specifying the time expended, services rendered, and expenses incurred while the case was pending . . . ."

Finally, although we recognize that the Social Security Act in 42 U.S.C. § 406(b) involves a multi-tiered adversarial process, as Defendants' say, a Social Security Administration regulation, 20 C.F.R. § 404.1725(b)(1)(vii), interprets § 406(b)'s "25 percent of the total of the past-due benefits" fee limitation as requiring the agency to evaluate the amount a representative requests for his or her services, but not for expenses incurred, when approving a fee request.  The statute then imposes a penalty upon

attorneys who charge, demand, receive, or collect for services rendered in connection with a proceeding a fee that exceeds this percentage limitation. The Defendants provide no plausible explanation for why § 406(b)'s fee limitation for services rendered excludes expenses, but the RECA's fee limitation for services rendered should be interpreted to include expenses. Indeed, the Defendants' argument that 42 U.S.C. § 406(b) is irrelevant because it involves a "multi-tiered adversary process," Aplee. Br. at 25, equally undermines the Defendants' reliance on § 1988 of the Civil Rights Act, which also involves a "multi-tiered adversary process."

The RECA's text and Congress's consistent, repeated distinction between "services rendered" and "expenses" demonstrates Congress's intent to exclude expenses from the attorney-fee limitation. Applying the Defendants' interpretation of the RECA would require a finding that the above statutes unnecessarily address "expenses" and "services rendered" separately. Put differently, if "services rendered" includes expenses, then it would appear that Congress used redundant language when enacting the several provisions that clearly distinguish between compensation for services rendered and reimbursement for expenses incurred. Since "words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute, Perrin v. United States, 444 U.S. 37, 42 (1979), and since "we should give effect, if possible, to [a statute's] every clause and word," Toomer v. City Cab, 443 F.3d 1191, 1194 (10th Cir. 2006), we find that "services rendered" plainly excludes "costs incurred."

The dissent argues that these statutes and other examples of common usage could

-13-

point our analysis in the opposite direction. Dissent, <u>infra</u>, at 4-5. She so concludes because Congress distinguished between expenses and services in those circumstances, but has not similarly done so here. <u>Id.</u> This argument is unpersuasive. The author of every statute and case we cite used "services" and "expenses" separately to outline affirmatively what the service provider could properly include on his or her billing statement. These examples demonstrated that when Congress, and ordinary speakers of English, speak about payment, "services" and "expenses" have different meanings—or else the repeated statements that the attorney may be reimbursed for expenses and paid for services would amount to surplusage. The fact that we do not find the same "services *and* expenses" language in this statute makes its meaning clearer, contrary to the dissent's position, when we understand the context in which the "services rendered" language appears here. Most important, the statutory section at issue does not catalog the list of charges an attorney may bill to his or her client. Instead, the section addresses what charges are subject to the 2% fee cap. When Congress repeatedly states that an attorney may recover "expenses" *and* receive a fee for "services," but in this statute decided to omit "expenses" from a provision *imposing a 2% fee cap* on "services," Congress made the precise distinction the dissent finds lacking. Just as a decision to eliminate "services" from a statute saying "you may be reimbursed for expenses" would count as strong evidence that the statute required an attorney to donate his or her time, a statute that imposes a fee cap only on services clarifies, not clouds, the decision to exclude expenses from the limitation.

-14-

**b.  The Purpose of 42 U.S.C. § 2210 note Sec. 9**

The RECA's text, in light of the words' meanings and other federal statutes, shows that Congress intended to exclude expenses from compensation for "services rendered" when creating the RECA's attorney-fee limitation.  While we need not proceed further to determine Congress's intent, our review of the RECA's legislative history and purposes buttresses our conclusion that Congress intended to give the RECA's words their ordinary meaning.

Congress's intent would be frustrated if we accepted the Defendants' interpretation of "services rendered."  The Defendants suggest that Congress intended to reduce the number of attorneys involved in submitting RECA claims and that the agency often provides claimants with the documents necessary to support their claims.  If "services rendered" includes expenses, however, an attorney would represent a client only when the expense of doing so is lower than the fee the attorney could collect out of the client's payment from the government (unless we assume that Congress intended to draft the RECA as a pro bono statute—a suggestion the Defendants denied in oral argument).  Since the RECA only provides for payments of $50,000 to $100,000, depending on the severity of the claimant's exposure to radiation, and since the Defendants seek to include the attorney's expenses within the attorney's maximum compensation (in many cases a 2% maximum, so either a $1,000 or $2,000 fee, including expenses), an attorney is likely to represent a RECA claimant only when the agency bears most of the client's expenses by providing the documentation necessary to support the client's claim.

-15-

Thus, the Defendants' interpretation provides an incentive for attorneys to represent RECA claimants only when the attorney can easily submit the claim by relying on the agency's resources. In sum, an attorney is incentivized to represent the claimant when the claimant has little need for an attorney. Yet in more difficult cases, when the agency is unable to provide most of the documentation and a claimant needs an attorney to search for the necessary information or advance funds to create the documentation (e.g., medical examinations), the attorney is incentivized not to represent the claimant because the cost of doing so would easily exceed the potential $1,000 or $2,000 fee. Incentivizing attorneys to represent clients in easy cases, and disincentivizing attorneys from representing clients in hard cases, directly contravenes what Congress intended, particularly given Defendants' assertion that the majority of claims fall within the former category.

For these reasons, this regulation hardly counts as a "close examination of the interests at play," see dissent, infra, at 5, when Congress drafted the statute. If Congress was skeptical "as to the value that attorneys actually bring to this particular process," id., then Congress would not have incentivized attorneys to represent RECA claimants only when the claimants are least in need of an attorney. Indeed, the Defendants' interpretation in 28 C.F.R. § 79.74(b) creates the perverse incentives that both the RECA and the Defendants themselves seek to avoid.

The Defendants and the district court also err by relying on the incomplete view that Congress designed the RECA fee limitation to avoid claimants' payments from being

-16-

diverted to non-claimants. To be sure, the RECA provision that "[n]o costs incurred by the Attorney General in carrying out this section shall be paid from the Fund . . ." reflects Congress's intent to avoid diverting money from the fund back to the government (which is perfectly sensible since but for the Government's wrongdoing we would not need the RECA). 42 U.S.C. § 2210 note Sec. 6(f) (precluding the Attorney General from collecting costs incurred). But Congress's intent to avoid diverting fund money to non-claimants, as expressed by Congress's decision to preclude the government from collecting its costs from the fund, did not translate into such a bar for private attorneys or clarify that Congress intended the words "services rendered" to encompass expenses.

Nor does Congress's intent on this point harmonize with the perverse incentives that the Defendants' interpretation creates. Indeed, Congress's intent to avoid diversion of fund money runs counter to 28 C.F.R. § 79.74(b)'s incentive for attorneys to represent RECA claimants only when the claimants do not need an attorney's assistance to submit a claim. Thus, this RECA provision (42 U.S.C. § 2210 note Sec. 6(f)) provides no support for the proposition that a payment for "services rendered" includes reimbursement for an attorney's expenses.

### c. Defendants' Additional Arguments for Affirmance

The Defendants urge us to defer to their construction of the statute for two additional reasons: first, they say that the RECA attorney-fee limitation is subject to more than one interpretation because courts have interpreted the fee-shifting provision of 42 U.S.C. § 1988 to include attorney fees and expenses, and because the expenses an

attorney will incur when representing a RECA claimant are indispensable to providing legal services; and second, they contend that it is unclear how the Plaintiffs' reference to the professional-responsibility rule that attorneys may not assume their clients' expenses supports the Plaintiffs' arguments, since the fact that clients were previously required to reimburse their attorneys for expenses suggests that expenses were part of the attorneys' fees.

The Defendants' second contention elides the point of the Plaintiffs' argument. The essence of this professional-responsibility rule is that an attorney was permitted to advance a client's expenses in the form of an interest-free loan so long as the client reimbursed the attorney when the attorney finished representing the client. The Plaintiffs are plainly arguing that, in light of this general rule that an attorney may not assume a client's expenses, to equate an *interest-free loan* that must be *reimbursed* with a *fee for services rendered* is to deny these words their ordinary meaning.

The Plaintiffs' argument is supported by several scholarly sources that clearly distinguish expenses and fees, therefore further underscoring the historical and lexical distinction between a fee for services rendered and reimbursement for costs incurred. See, e.g., Restatement (Third) of Law Governing Lawyers § 38 cmt. e (2000) (stating that "[u]nder generally prevailing practice, the actual amount of disbursements to persons outside the office . . . are charges *in addition to the lawyer's fee*" and that [c]ourt costs and expenses of litigation . . . are normally payable by clients") (emphasis added); Robert L. Rossi, 1 Attorneys' Fees § 1:27 (3d ed. 2006) (stating that "[t]he client, and not the

attorney, is ultimately liable for the reasonable and proper expenses incurred incident to the preparation and trial of a case, and thus an attorney may bind his client to pay for such expenses incurred by the attorney").

Even a common-law action for recovering a money debt recognized that owing another for work done is different from owing another for money paid: "In the action of *assumpsit*, these [common counts inserted in a declaration in an action to recover a money debt] are as follows: . . . for work done; . . . for money paid . . . ."  Black's Law Dictionary 419 (4th ed. 1968) (supplying the definition of "[c]ommon counts").  We could not merge these historically distinct concepts—paying another for the work he or she has done (i.e., the service) versus paying another for the money he or she has paid (i.e., the expense)—without ignoring the principle that words in a statute carry their ordinary meaning.

Notwithstanding both this historical backdrop and the dictionary's support for this argument, the district court rejected it because of the court's view that several jurisdictions have jettisoned the rule of champerty.  The status of the rule of champerty, however, does not alleviate the problem with treating words that are historically different in meaning as synonyms.  The rule's formulation clearly distinguishes between an attorney's fee for services and the reimbursement for expenses incurred incident to providing those services.  The rule, regardless of its current prevalence in States' professional-responsibility codes, highlights the fact that a fee for services rendered is not the equivalent of reimbursement for costs incurred.

-19-

After rejecting this argument, the district court found traction in the Defendants' position that the RECA is analogous to fee-shifting statutes that include costs as part of the attorneys' fees. The court first reasoned that the Defendants' interpretation reflects Congress's unambiguous intent because "Congress did not limit its language to exclude attorneys' expenses and include only attorneys' hourly wages." Dist. Ct. Order at 13. Yet the district court failed to recognize that neither did Congress expressly expand the fee limitation to apply to attorneys' expenses as well as attorneys' hourly wages—unless "services rendered" unequivocally means one or the other. Instead of evaluating this issue, as we did above, the district court continued by concluding that both the RECA's purpose and the case law interpreting fee-shifting statutes are consistent with the Defendants' interpretation of "services rendered."

As only the Plaintiffs have recognized, however, § 1988 of the Civil Rights Act provides that courts may award "a reasonable attorney's fee as part of the costs," whereas the RECA states that "the representative of an individual may not receive, *for services rendered* in connection with the claim of an individual under this act, [a payment exceeding the percentages specified in the below subsections] . . . ." (emphasis added). For one thing, we find unpersuasive the Defendants' attempt to interpret the RECA's fee provision by reference to another statute's completely different language. We also note that the Defendants fail to address why Congress used strikingly different language in the RECA and §1988 fee provisions if it intended these provisions to mean the same thing.

Moreover, it is irrelevant here that both the RECA and the § 1988 attorney-fee

-20-

sections define how to calculate the fees an attorney may receive under the Acts under similar headings ("Attorney Fees" in the RECA and "Attorney's fees" in § 1988), for "we should look to the statutory definition of the term and begin with the ordinary meaning of that language rather than with the 'ordinary meaning' of the term that Congress thought it advisable to define." United States v. Begay, 470 F.3d 964, 971 (10th Cir. 2006). But instead of considering the meaning of the RECA's text and the several statutes examined above—statutes that actually use the same "services rendered" language that is at issue here—the Defendants and the district court found it sufficient to examine only 42 U.S.C. § 1988, a statute that is wholly different from the RECA in structure, history, and language.

The function of § 1988's fee-shifting provision is so dramatically different from the provision under consideration that it strains reason to conclude that § 1988 reveals the meaning of the RECA's "services rendered" language. While § 1988 was designed to incentivize attorneys to act as private attorneys general by bringing more federal lawsuits, the Defendants inform us that the RECA was designed to reduce the number of attorneys who represent radiation-exposure victims when legal representation is unnecessary and that the RECA fee limitation was designed to avoid diverting funds to non-claimants (an assertion we view to be incomplete). See S.Rep. 94-1011, at 5910, 5914, The Civil Rights Attorney's Fees Awards Act of 1976 (June 29, 1976) (stating that the purpose of allowing the prevailing party to recover the fee is to incentivize private citizens to act as private attorneys general in vindicating federal rights protected under the statute; that not

-21-

to award fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose; and that, appropriately applied, the fee award should function to attract competent counsel, but not produce windfalls to attorneys). See also H.R. Rep. 102-40(I), Civil Rights Act of 1991 (Apr. 24, 1991) (explaining that Title VII's fee-shifting provision, 42 U.S.C. § 2000e-5(k), was intended to encourage private citizens to enforce the statute's guarantees and that if successful plaintiffs were forced to bear their own attorneys' fees, few aggrieved parties would be in the position to advance the public interest).

Again without referring to the RECA's language, the Defendants further support their arguments by claiming that the expenses incurred by a RECA claimant's attorney are necessary for the attorney to furnish effective representation. Given the alleged importance of these expenses, Defendants conclude that it is reasonable to infer that Congress intended to include expenses within the fee limitation. But with this note the Defendants have described almost any area of legal practice. As we discussed above, certainly one would not suggest that a trial attorney's payments to an expert witness, to the client's treating doctor to testify, and to the hospital for the client's medical records are less essential to effective representation than the expenses of a RECA claimant's attorney. A plaintiff will rarely have a legally cognizable claim without this information and testimony, and it would likely be malpractice for a defense attorney to forgo this type of investigation.

Procuring documents and hiring experts to give their opinions, and incurring the

resulting expenses, are essential parts of representing a client in almost any area of law. Yet common meaning and the above federal statutes still maintain a clear distinction between compensation for "services rendered" and reimbursement for "expenses." The Defendants' assertion that attorneys' expenses are especially essential in RECA claims is unpersuasive and certainly does not support altering the ordinary meaning of Congress's words.

Since we assume that Congress intended the words in the RECA to carry their ordinary, contemporary, common meaning, and since our review of the statute's text, purpose, and legislative history provides no indication that Congress intended to deviate from its longstanding distinction between and the common meaning of compensation for "services rendered" and reimbursement of "expenses," we conclude that 28 C.F.R. § 79.74(b) contravenes Congress's unambiguous intent.

### 2. <u>Chevron</u> Step Two

The Supreme Court's <u>Chevron</u> decision explains that we must determine whether the regulation is arbitrary, capricious, or contrary to the statute only if Congress has not directly addressed the precise question at issue. <u>Chevron</u>, 467 U.S. at 842-44. Since the plain meaning of "services rendered" reveals Congress's unambiguous intent to exclude expenses from the attorney-fee limitation, our inquiry ends at <u>Chevron</u>'s first step.

The Defendants' interpretation of the RECA's attorney-fee limitation, 28 C.F.R. § 79.74(b), is invalid. Accordingly, we **REVERSE** the district court's decision and **REMAND** for further proceedings consistent with this opinion.

No. 05-1509, Hackwell v. United States of America

**BRISCOE**, Circuit Judge, dissenting:

I respectfully dissent. I would affirm the district court's dismissal of the plaintiffs' Administrative Procedures Act and Fifth Amendment claims. I disagree with the majority's conclusion that the phrase "services rendered" contained in 42 U.S.C. § 2210 note 9 unambiguously refers only to attorney fees incurred in connection with a successful Radiation Exposure Compensation Act (RECA) claim, and does not also include expenses. Instead, I conclude that the phrase "services rendered" is ambiguous, and that the Attorney General's interpretation of the phrase to include expenses within the definition of "services rendered" as set forth in 28 C.F.R. § 79.74(b), is a permissible construction of that language.

As the majority's opinion correctly notes, the two-step analysis outlined in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) determines the outcome of this case. The first Chevron step requires us to ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. The precise question at issue in this case is whether attorneys may recover full reimbursement of expenses incurred in preparing a claim under the RECA when the amount of those expenses, when combined with attorney fees, exceeds RECA's two-percent cap on attorney compensation. The majority mistakenly concludes that the two-percent cap on payments to attorneys "*for services rendered* in connection with" a RECA claim in no way limits an

attorney's reimbursement <u>in</u> <u>full</u> for expenses incurred in preparing the claim. 42 U.S.C. § 2210 note Sec. 9 (emphasis added).

Looking first at the statute's plain text, RECA neither defines "services rendered" nor makes clear that compensation for "services rendered" would include expenses. The statute is simply silent as to what activities Congress would include within its definition of "services rendered." The majority is correct that "services rendered" could be interpreted to mean only those actions involving legal skills, such as filling out forms, obtaining the proper supporting documents, and providing legal advice. At the same time, the defendants are also correct that the term might additionally include the expenses incurred in the preparation of a RECA claim. If the "service" being "rendered" is the preparation of a complete RECA application, then obtaining necessary documentation and medical reports to prove injury is an inseparable and necessary component of that service. When a client subsequently repays an attorney for the expenses incurred in procuring this supporting documentation, then the attorney has received a payment for the service rendered of compiling that documentation. The statute fails to directly address which view of "services rendered" is correct, either by defining the term or contrasting it with expenses. While the majority doubts whether RECA's "services rendered" language can be plausibly interpreted to include expenses incurred in obtaining necessary documentation, its skepticism rests mainly on its interpretation of the term "service" as excluding expenses incurred in obtaining necessary documentation, and that a contrary interpretation of the term "service" will have negative policy consequences. The

majority's interpretation of "service," while reasonable, does not rest upon any express statement of congressional intent.

Nor does the statute's legislative history furnish the necessary clarity. The congressional reports and debates accompanying RECA fail to tackle this issue or shed light on how Congress would resolve the differing interpretations proffered by the parties. Further, the statute's purpose – "to make partial restitution" to victims of radiation exposure – points in no clear direction. The majority's interpretation of "services rendered" may promote that goal by increasing the likelihood that individuals wishing to file a RECA claim will have access to effective counsel. While at the same time, the defendants' interpretation of "services rendered" may also further that goal by ensuring that victims receive ninety-eight percent of their award without qualification. Therefore, because the phrase "services rendered" is subject to differing interpretations, it is ambiguous and the proper course is to defer to the agency's interpretation if it is reasonable. Bd. of County Comm'rs v. United States EEOC, 405 F.3d 840, 845 (10th Cir. 2005).

To fill the definitional void presented, the majority relies on two sources. First, it points to dictionary definitions. Second, it points to other fee-shifting statutes. As regards the dictionary definitions, the majority notes that "services" is defined as "the performance of any duties or work for another" and "expenses," is defined in part, as "money paid as reimbursement for such charges. . . ." (Maj. Op. At 7). From this starting point, the majority classifies an expense as a mere reimbursement for a charge rather than

compensation for an attorney's work (a service).

If our responsibility under Chevron's initial step was to give meaning to an unclear statutory phrase, I might find the majority's analysis compelling. Instead, our task is to determine whether "services rendered" unambiguously conveys congressional intent regarding the treatment of expenses within the RECA's statutory framework. It is true that the ordinary meaning of words, as embodied in dictionary definitions, may provide "some guidance" as to what Congress intended. Anderson v. United States DOL, 422 F.3d 1155, 1180-82 (10th Cir. 2005). Yet we have never held that a dictionary definition, standing alone, will control when Congress has otherwise failed to make its intent known. See, e.g., id. at 1182 (determining that the phrase "authorized representative" was "far from clear" because the phrase's plain meaning, as discovered in dictionaries, failed to answer the issue before the court); Biodiversity Legal Found. v. Babbitt, 146 F.3d 1249, 1254 (10th Cir. 1998) (concluding that the phrase "'maximum extent practicable' . . . remain[ed] ambiguous because neither the statutory language nor its ordinary meaning specifie[d]" what Congress meant). While a dictionary definition may allow us to make an educated *guess* about Congress' intent, the statute's essential opacity prevents us from reaching a more definitive conclusion.

The majority next compares § 2210 to other fee-shifting statutes which clearly make a distinction between "services rendered" and "expenses." For instance, 11 U.S.C. § 503(b)(4) provides: "After notice and a hearing, there shall be allowed, administrative expenses, . . . including . . . reasonable compensation for professional services rendered

by an attorney . . . . *and* reimbursement for actual, necessary expenses incurred by such attorney or accountant." (emphasis added). But instead of leading us to a clearer understanding of what Congress meant by "services rendered" in the statute at hand, statutes like these highlight what § 2210 lacks: a clear expression of congressional intent which separates "services rendered" from "expenses." The majority's examples demonstrate that Congress knows how to distinguish fees from expenses when it wishes, but yet it clearly failed to do so here. At most, the majority's comparison of § 2210 with other fee-shifting statutes may lend support to interpreting "services rendered" as a concept distinct from "expenses." But these comparisons do not provide us with an unambiguous indication of what Congress intended when it used the phrase "services rendered" in § 2210.

As § 2210 is ambiguous, the Attorney General's regulation, 28 C.F.R. § 79.74(b), survives our review if it is a "permissible" interpretation. Anderson, 422 F.3d at 1182. "[W]e uphold an agency's construction of a statute it administers so long as it is not arbitrary, capricious, or manifestly contrary to the statute at issue." Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 727 (10th Cir. 2006) (citation omitted). As explained above, the phrase "services rendered" can be reasonably interpreted to include expenses. When a client repays an attorney for expenses incurred in completing a RECA application, the attorney has received a payment for his services in collecting and attaching the necessary documentation. As the Attorney General concluded, "[o]btaining and submitting the documentation necessary to substantiate a claim is a large part of the

-5-

'service' rendered to a client." Representatives and Fees, 69 Fed. Reg. 13628, 13633 (Mar. 23, 2004).

In addition, the challenged regulation is based on close examination of the interests at play. The Attorney General concluded that allowing full recovery of costs and expenses would compensate attorneys for services – such as gathering necessary documentation – that the Department of Justice already provides to claimants. Id. As a result, the import of the challenged regulation is to maximize the award given to claimants or eligible beneficiaries. Id. The challenged regulation also expresses skepticism, apparently shared by Congress, as to the value that attorneys actually bring to this particular process. Id.

Because 28 C.F.R. § 79.74(b) is a permissible interpretation of 42 U.S.C. § 2210 note Sec. 9's compensation provision, I would affirm the district court's dismissal of the plaintiffs' claims.