**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 5, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED KEETOOWAH BAND OF
CHEROKEE INDIANS OF
OKLAHOMA,

    Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT; ALPHONSO
JACKSON, Secretary of the United
States Department of Housing and
Urban Development; ORLANDO J.
CABRERA, Assistant Secretary for
Public and Indian Housing,

    Defendants - Appellees,

----------------------------

CHEROKEE NATION,

    Amicus Curiae.

No. 08-7025

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 06-CV-00533-RAW)**

---

James C. McMillin (Michael D. McClintock, Tamara Schiffner Pullin of McAfee
& Taft, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff -
Appellant.

Patricia Sharin Flagg, Senior Trial Attorney of U.S. Department of Housing and Urban Development, (Sheldon J. Sperling, United States Attorney, Linda A. Epperley, Assistant United States Attorney, Muskogee, Oklahoma, with her on the brief), Washington, D.C., for Defendants - Appellees.
A. Diane Hammons, Attorney General of Cherokee Nation, Tahlequah, Oklahoma, for Amicus Curiae.

---

Before **KELLY**, **BRISCOE**, and **McCONNELL**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiff-Appellant, the United Keetoowah Band of Cherokee Indians of Oklahoma ("UKB"), is challenging a final agency action by the United States Department of Housing and Urban Development ("HUD") which drastically reduced the federal funding that the UKB received for housing under the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA), 25 U.S.C. §§ 4101-4243. The basis of the UKB's claim, in essence, is that HUD's decision was arbitrary and capricious (1) as a substantive matter because HUD's regulations implementing NAHASDA were contrary to the clear language of that statute, and (2) as a procedural matter because of various alleged defects in the process leading up to HUD's final agency action. The district court rejected the UKB's challenge, finding that HUD's regulations survived scrutiny under <u>Chevron</u> deference and concluding that the procedure employed by HUD was not arbitrary or capricious. <u>United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. and Urban Dev.</u>, No. CIV-06-533-RAW, slip. op. at

5-10 (E.D. Okla. Jan 9, 2008).  The UKB now appeals the district court's order.

Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.


Background

A.     Funding Scheme under NAHASDA

This case involves HUD's implementation of NAHASDA, a federal statute

enacted to provide funding to Native American tribes in order to "help[] tribes

and their members . . . improve their housing conditions and socioeconomic

status."  25 U.S.C. § 4101(5).[1]  Adopted in 1996, NAHASDA established a

housing-assistance program that was funded directly through Indian Housing

Block Grants ("IHBG"), id. § 4111, and disbursed to tribes on the basis of Indian

Housing Plans prepared by the tribes and submitted to HUD, id. § 4112.  All

federally-recognized and state-recognized Indian tribes are eligible for IHBG

funding.  24 C.F.R. § 1000.202; see 25 U.S.C. § 4103(12).  The amount of IHBG

funding each eligible tribe receives is determined in accordance with the

allocation formula established by HUD pursuant to a negotiated rulemaking

procedure and contained in the implementing regulations.  25 U.S.C. §§ 4116(b),

4151, 4152(a).  While Congress delegated to HUD the authority to create the

_____

[1] Throughout this opinion, all citations to statutes are to those in effect at
the time.  NAHASDA was amended in 2008 by the Native American Housing
Assistance and Self-Determination Reauthorization Act of 2008, Pub. L. No. 110-
411, 122 Stat. 4319 (2008).

allocation formula, Congress also circumscribed HUD's discretion by specifically stating that the formula must be "based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities." Id. § 4152(b).

The formula HUD created has two components: (1) Formula Current Assisted Housing Stock ("FCAS"), and (2) Need. 24 C.F.R. § 1000.310. Generally, the amount of annual funding for an Indian tribe is the sum of the FCAS component and the Need component. The Need component, the only component at issue here, is based on seven criteria set forth in the regulations—criteria such as the number of tribal households with income below a median income level and the number of households without kitchens and plumbing.[2] Id. § 1000.324. None of the criteria references court jurisdiction over a geographic area. In addition to these seven criteria, HUD has also created a "Formula Area" requirement. While the regulations do not say so explicitly, HUD apparently only applies the seven § 1000.324 criteria to Indian households within an applicant tribe's Formula Area. Therefore, applicant tribes must show

_____

[2] The criteria, each weighted differently, include (1) American Indian and Alaskan Native (AIAN) households with housing cost burden greater than 50% of "formula area income," (2) AIAN households that are overcrowded or without kitchen or plumbing, (3) AIAN housing shortage, (4) AIAN households with income less than or equal to 30% of "formula median income," (5) AIAN households with income between 30% and 50% of "formula median income," (6) AIAN households with income between 50% and 80% of "formula median income," and (7) AIAN persons. 24 C.F.R. § 1000.324.

-4-

that they possess a Formula Area in order to receive need-based funding under

§ 1000.324. At the time, the regulations defined "Formula Area" as

> the geographic area over which an Indian tribe could exercise court jurisdiction or is providing substantial housing services and, where applicable, the Indian tribe . . . has agreed to provide housing services pursuant to a Memorandum of Agreement with the governing entity or entities (including Indian tribes) of the area, including but not limited to: . . .
>           . . .
> (vi) Former Indian Reservation Areas in Oklahoma as defined by the Census as Tribal Jurisdictional Statistical Area.

24 C.F.R. § 1000.302.[3] However, even though the Formula Area requirement acts

as a threshold for need-based funding under § 1000.324, tribes that do not possess

a designated Formula Area are still entitled to a minimum funding amount under

§ 1000.328. Id. § 1000.328. See generally Fort Peck Hous. Auth. v. U.S. Dep't

of Hous. and Urban Dev., 435 F. Supp. 2d 1125, 1127-29 (D. Colo. 2006)

(describing NAHASDA's funding mechanism).

B.      Agency Decision to Award Minimum Funding to the UKB

It is undisputed that the UKB received IHBG funding above the minimum

amount for the fiscal years 1997-2005. United Keetoowah Band, No. CIV-06-

533-RAW, slip. op. at 2. For each of these fiscal years, HUD determined that the

UKB shared a Formula Area with the Cherokee Nation of Oklahoma ("CNO") in

---

[3] 24 C.F.R. § 1000.302 has since been amended. However, it retains the court jurisdiction requirement and appears to perform the same function as it did at the time this dispute arose. The parties have not suggested that the amendment substantively altered the regulation, at least insofar as our inquiry is concerned.

the CNO's "Tribal Jurisdictional Statistical Area/Oklahoma Tribal Statistical Area." However, this determination was called into question on June 14, 2004, when the CNO wrote a letter to HUD challenging the UKB's right to receive IHBG funding. In the letter, the CNO claimed jurisdiction over the Tribal Jurisdictional Statistical Area to the exclusion of the UKB. Accordingly, HUD interpreted the substance of the challenge to be that the UKB should not receive more than the minimum funding allocation because the tribe could not claim a Formula Area as defined in 24 C.F.R. § 1000.302. After reviewing the matter, HUD issued a memorandum on January 19, 2005, in which the agency concluded that the UKB had "no jurisdiction or regulatory basis" for being assigned a Formula Area because only the CNO could assert jurisdiction over the Oklahoma Tribal Statistical Area and the UKB had no Memorandum of Agreement with the CNO. HUD stated that the formula correction, which rendered the UKB ineligible "for funding under the Need component of the IHBG formula," would become effective for fiscal year 2006.

On February 11, 2005, the UKB requested that HUD reconsider its determination that the UKB had no jurisdiction over and therefore could not be assigned a share of the Oklahoma Tribal Statistical Area. After further inquiry into the matter, HUD reversed itself on April 26, 2005, finding that the UKB did in fact "meet the regulatory basis under the IHBG program for being assigned a share of the Cherokee Oklahoma Tribal Statistical Area" because the UKB could,

-6-

in HUD's estimation, "exercise court jurisdiction" over the area. Accordingly, on the basis of the UKB's ability to claim the Oklahoma Tribal Statistical Area as its Formula Area, HUD granted the UKB $545,989 in funding for the fiscal year 2006. HUD also informed the CNO, on October 18, 2005, that it had the "right to appeal this decision" to assign the UKB a share of the Oklahoma Tribal Statistical Area.

This prompted an administrative appeal by the CNO on November 16, 2005. The appeal contained a detailed legal argument designed to show that the CNO possessed exclusive jurisdiction over the Oklahoma Tribal Statistical Area. This argument was based in part on our decision in United Keetoowah Band of Cherokee Indians v. Mankiller, in which we reaffirmed that "the Cherokee Nation is the only tribal entity with jurisdictional authority in Indian Country within the Cherokee Nation."[4] No. 93-5064, 1993 WL 307937, *4 (10th Cir. Aug. 12, 1993) (unpublished). In response, HUD reversed itself again on February 7, 2006, concluding that the "the UKB could not exercise court jurisdiction over land in the Cherokee former reservation area." The UKB, predictably, then challenged this new decision in a letter dated March 27, 2006. HUD denied this request for reconsideration on November 3, 2006, in a letter described as a "final agency

---

[4] We have also adjudicated another case involving the UKB's jurisdiction in Buzzard v. Oklahoma Tax Comm'n, 992 F.2d 1073, 1077 (10th Cir. 1993) (holding that the UKB could not claim land held in fee simple as "Indian country" where the federal government had not set apart the land for the UKB's use).

action." HUD based the denial on its conclusion that the UKB

> failed to show that it possesses a Formula Area, as that term is
> defined pursuant to 24 C.F.R. § 1000.302, because it has neither a
> geographic area over which it could exercise court jurisdiction nor an
> area in which it provides substantial housing services pursuant to a
> Memorandum of Agreement with the governing entity, the [CNO].

Accordingly, HUD awarded the UKB only the minimum funding allocation under

24 C.F.R. § 1000.328.

The UKB then sought judicial review in federal district court under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. The UKB argued

that Chevron deference should not apply to 24 C.F.R. § 1000.302 and asserted

several bases to show that HUD had acted arbitrarily and capriciously. United

Keetoowah Band, No. CIV-06-533-RAW, slip. op. at 5. However, the district

court applied Chevron deference and found that HUD had not acted arbitrarily

and capriciously. Id. at 5-10. The UKB now appeals this decision. The main

issue before us is whether NAHASDA is clear and unambiguous such that we

should not grant Chevron deference to the implementing regulations.


Discussion

When reviewing a final agency action, an appellate court "take[s] an

independent review of the agency's action and [is] not bound by the district

court's factual findings or legal conclusions." Utah Envtl. Cong. v. Russell, 518

F.3d 817, 823 (10th Cir. 2008) (internal quotation marks omitted); see N.M.

Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 248 F.3d 1277, 1281 (10th Cir. 2001). Here, given that the challenge is brought under the APA, we will set aside the final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Utah Envtl. Cong., 518 F.3d at 823. Generally, we will find an agency's action to be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see Qwest Commc'ns Int'l, Inc. v. FCC, 398 F.3d 1222, 1229 (10th Cir. 2005).

Our standard of review under the arbitrary and capricious rubric is narrow, and we may not substitute our own judgment for that of the agency. Mainstream Mktg. Servs., Inc. v. FTC, 358 F.3d 1228, 1248 (10th Cir. 2004). However, as we have previously recognized, the narrow nature of our review under the arbitrary and capricious standard does not mean that the review is insubstantial; to the contrary, we are required "to engage in a substantial inquiry" and to conduct a "thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see Qwest Commc'ns Int'l, 398 F.3d at 1229.

I.      *Chevron* Deference

-9-

The central issue presented by this appeal is the extent of deference that we owe to the agency's interpretation of NAHASDA, as embodied in HUD's implementing regulations. In determining how much deference is owed, we first seek to determine "whether Congress has directly spoken to the precise question at issue," Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984), by looking to, among other things, the statutory text, history, and purpose, Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004). If Congress has spoken directly to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent. Chevron, 467 U.S. at 842-43. If the statute is silent or ambiguous, we proceed to step two and ask "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. While we must not impose our own construction of the statute under this inquiry, we will not defer to an agency's construction if it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 843-44; see Ctr. for Legal Advocacy v. Hammons, 323 F.3d 1262, 1267 (10th Cir. 2003). See generally Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 727 (10th Cir. 2006); Nutraceutical Corp. v. Von Eschenbach, 459 F.3d 1033, 1037-38 (10th Cir. 2006); Qwest Commc'ns Int'l, 398 F.3d at 1229-30.

In this case, the "precise question at issue" is whether Congress unambiguously manifested its intent that HUD base its allocation formula solely on need-based criteria and, if so, whether the Formula Area requirement in

HUD's implementing regulations comports with this unambiguous requirement. The UKB argues that the Formula Area requirement of 24 C.F.R. § 1000.302—and, more specifically, the fact that possession of a Formula Area requires an Indian tribe to (1) exercise court jurisdiction, or (2) provide substantial housing services and, where applicable, possess a Memorandum of Agreement with the governing entity[5]—is contrary to Congress's plainly expressed intent because NAHASDA unambiguously states that the amount of IHBG funding must be based on need. The UKB contends that possessing a

---

[5] This opinion focuses on the court jurisdiction requirement because the parties do not dispute that the UKB must have a Memorandum of Agreement with the CNO if it is to claim a Formula Area under the second part of the definition. We assume without deciding that such is the case, and note that the UKB has been unable to secure such a Memorandum of Agreement.

However, it is worth observing that the record does not establish that the housing the UKB subsidizes is in Indian country. While court jurisdiction is complex, as a general matter, Indian tribes exercise court jurisdiction over Indian country—reservations, dependent Indian communities, and Indian allotments. 18 U.S.C. § 1151; see California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208 n.5 (1987) (stating that § 1151 applies to questions of civil jurisdiction). See generally Cohen's Handbook of Federal Indian Law §§ 3.04[2][c], 4.07[1][b] (5th ed. 2005). It seems, then, that if the housing lies outside of Indian country, the UKB would not need a Memorandum of Agreement with the CNO because the CNO would not be the "governing entity." 24 C.F.R. § 1000.302; see Kansas v. United States, 249 F.3d 1213, 1228 (10th Cir. 2001) (stating that a sovereign must have jurisdiction over land in order to "exercise governmental power over it"). The dissent cites Kansas for the proposition, apparently, that the Indian tribe must have court jurisdiction before it provides any housing assistance. Dissent at 9. However, a tribe does not have to have court jurisdiction in order to provide such assistance. See Narragansett Indian Tribe of Rhode Island v. Narragansett Elec. Co., 89 F.3d 908, 910-11, 915-22 (1st Cir. 1996) (involving a situation where an Indian tribe provided housing assistance on land that did not qualify as "Indian country").

-11-

Formula Area does not reflect a tribe's need for housing assistance because its need-based funding was "zeroed out" in 2006 not because of any drop in needy households, but merely because HUD concluded that the UKB had no Formula Area. According to this argument, then, the imposition of the Formula Area requirement (a non-need-based factor) is inconsistent with unambiguous language in the statute and therefore should not receive <u>Chevron</u> deference.

As in all cases where we must construe a statute, our primary task is to "determine congressional intent, using traditional tools of statutory construction." <u>NLRB v. United Food & Commercial Workers Union</u>, 484 U.S. 112, 123 (1987) (internal quotation marks omitted). As we always do in "cases requiring statutory construction, we begin with the plain language of the law." <u>St. Charles Inv. Co. v. Comm'r of Internal Revenue</u>, 232 F.3d 773, 776 (10th Cir. 2000) (internal quotation marks omitted). We must assume that the ordinary meaning of the words Congress uses conveys its intent. <u>Id.</u>; <u>see</u> <u>Harbert v. Healthcare Servs. Group, Inc.</u>, 391 F.3d 1140, 1148 (10th Cir. 2004). Furthermore, "[w]here the language of the statute is plain, it is improper for this Court to consult legislative history in determining congressional intent." <u>St. Charles Inv. Co.</u>, 232 F.3d at 776. Therefore, we turn first to the precise language of the statute and, finding that language to be unambiguous, our inquiry will end there. <u>See</u> <u>United States v. Zamudio</u>, 314 F.3d 517, 521 (10th Cir. 2002) ("If the statutory language is clear, our analysis ordinarily ends." (internal quotation marks omitted)).

A.    The Unambiguous "Need" Requirement of Section 4152(b)

Section 4152(b) states that "[t]he formula <u>shall be based</u> on factors that reflect <u>the need</u> of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities."[6]  25 U.S.C. § 4152(b) (emphasis added).  This language explicitly and unambiguously mandates that the factors in HUD's allocation formula reflect—in other words, have some connection or nexus with—the need of Indian tribes and Indian areas of the tribes.  The language does not permit of any other reading.[7]  Moreover, though HUD argues to

---

[6] At the time, § 4152 provided in relevant part:

(a) Establishment
   The Secretary shall, by regulations . . . . establish a formula to provide for allocating amounts available for a fiscal year for block grants under this chapter among Indian tribes in accordance with the requirements of this section.
(b) Factors for determination of need
   The formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including the following factors:
       (1) The number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary.
       (2) The extent of poverty and economic distress and the number of Indian families within Indian areas of the tribe.
       (3) Other objectively measurable conditions as the Secretary and the Indian tribes may specify.

25 U.S.C. § 4152.  While § 4152 has since been amended, it retains the operative language we analyze here.

[7] HUD argues that NAHASDA is ambiguous because it "neither *prohibit[s]* HUD from considering a tribe's Formula Area . . . nor *require[s]* such

(continued...)

-13-

the contrary, there is no other language in the statute creating ambiguity such that we would have to apply deference under Chevron's step two.

First, HUD contends that the language in the statute regarding "Indian areas" permits HUD to introduce a geographic component to the allocation formula. Aplee. Br. 18. NAHASDA does state that the formula must be based on the need of the Indian tribes "and the Indian areas of the tribes." 25 U.S.C. § 4152(b). This language, at first blush, suggests that Congress might have contemplated a requirement that a tribe exercise court jurisdiction over a geographic area. However, NAHASDA's definition of "Indian area" makes it clear that Congress did not open the door for a requirement of court jurisdiction when it used the term "Indian area." NAHASDA's definitional section states that "[t]he term 'Indian area' means the area within which an Indian tribe . . . provides assistance under this Act for affordable housing." Id. § 4103(10). According to this definition, all that the use of the term "Indian area" in § 4152(b) indicates is that HUD must take into consideration the need of the area in which the applicant Indian tribe provides housing assistance—it does not indicate that HUD may

---

[7](...continued)
consideration." Aplee. Br. 9. HUD contends that this "silence with respect specifically to formula area" means that Congress's intent is unclear. Id. This misconstrues the inquiry, because NAHASDA does explicitly limit the kinds of factors that HUD may employ in its formula: the factors must be based on need. Given that HUD fails to make any showing that the Formula Area court jurisdiction requirement complies with this limitation, it follows that NAHASDA actually does expressly prohibit HUD from considering court jurisdiction.

-14-

exclude an Indian tribe from receiving funding under 24 C.F.R. § 1000.324 simply because the tribe does not exercise court jurisdiction over that area.

Second, HUD claims that NAHASDA is ambiguous in that Congress enumerated several factors that HUD could consider in creating the allocation formula and included a catch-all factor arguably broad enough to permit the jurisdictional requirement of 24 C.F.R. § 1000.302. NAHASDA does list as one factor such "[o]ther objectively measurable conditions as the Secretary and the Indian tribes may specify." 25 U.S.C. § 4152(b)(3). However, the existence of this catch-all factor does not create ambiguity in the statute, because even the "other objectively measurable conditions" must be related to need. When interpreting the meaning of this statutory language, we "must examine the . . . language in context, not in isolation." United States v. Nichols, 184 F.3d 1169, 1171 (10th Cir. 1999) (internal quotation marks omitted). Section 4152(b) states that the formula must be based on "factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities, including" three specific factors. 25 U.S.C. § 4152(b). Included in the list of three factors is the "other objectively measurable conditions" factor. See id. § 4152(b)(3). Thus, it is clear from looking at the structure and language of § 4152(b) in its entirety that Congress did not allow for non-need-based considerations when it included subsection (b)(3). Rather, subsection (b)(3) is simply one of the need-based factors that Congress explicitly specified; to the

-15-

extent it functions as a catch-all factor, it is a catch-all for *need-based* considerations only.

Finally, HUD argues that the fact Congress delegated to HUD the authority to create an allocation formula means that we should defer to HUD's construction of that formula. While it is true that Congress delegated significant authority to HUD, 25 U.S.C. § 4152(a) ("The Secretary shall . . . establish a formula to provide for allocating amounts available for a fiscal year for block grants . . . ."), that does not grant HUD license to ignore the parameters set forth by Congress. The same section that delegates authority to HUD expressly states that when HUD establishes an allocation formula, it must do so "in accordance with the requirements of this section." Id. As we have seen, one of those requirements is that "[t]he formula shall be based on factors that reflect the need" of the tribes. Id. § 4152(b). Accordingly, while HUD may create a funding formula and may exercise significant discretion in doing so, the factors it adopts must reflect the need of applicant tribes. Because the regulations do not meet this standard (for the reasons discussed below), they violate the "intelligible principle" Congress set forth to guide HUD. Our system of administrative law is premised on the rule that when "Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" Whitman v. Am. Trucking Assoc., 531 U.S. 457, 473 (2001) (quoting J.W. Hampton, Jr., & Co. v. United

<u>States</u>, 276 U.S. 394, 409 (1928)) (emphasis omitted). We would stand this rule—and our system of administrative law—on its head if we were to simply accept the delegation itself as the license for HUD to establish a non-need-based factor, contrary to the guidelines established by Congress.

The dissent makes much of the fact that "jurisdiction" is referenced in 25 U.S.C. § 4112(c), the section setting forth statutory requirements for Indian Housing Plans.[8] Dissent at 2-4. However, we are not convinced that the reference renders § 4152 ambiguous. First, and most importantly, the reference to jurisdiction in its generic sense does nothing to suggest that HUD was free to impose a requirement of *court* jurisdiction. The dissent assumes that the terms "jurisdiction" and "court jurisdiction" are automatically co-terminous, but they are not necessarily so in this context. <u>See, e.g.</u>, <u>Narragansett Indian Tribe of Rhode Island v. Narragansett Elec. Co.</u>, 89 F.3d 908, 910-11, 915-22 (1st Cir. 1996) (holding that an Indian housing project was not "Indian country" and that

---

[8] While the dissent claims that we "ignore" the important canon of statutory construction that we are to consider the statute as a whole, Dissent at 1-2, we do not do so. Rather, viewing the statute as a whole, <u>Sierra Club v. El Paso Gold Mines, Inc.</u>, 421 F.3d 1133, 1143 (10th Cir. 2005), we see nothing that calls into question the facially unambiguous language of 25 U.S.C. § 4152(c), including the language in § 4112. "The language of the statute must be the primary source of any interpretation and, when that language is not ambiguous, it is conclusive 'absent a clearly expressed legislative intent to the contrary.'" <u>Miller v. C.I.R.</u>, 836 F.2d 1274, 1283 (10th Cir. 1988). Here, after "[l]ooking at the entire statute, we fail to find a clearly expressed legislative intent that the words in the statute do not mean what they say." <u>Id.</u>

-17-

the tribe did not have exclusive court jurisdiction over it even though it was overseen by an Indian housing authority that exercised some degree of control—or "jurisdiction"—over the project). In fact, HUD's own regulations make it clear that they are not synonymous, given that the regulations state that "[w]henever the term 'jurisdiction' is used in NAHASDA it shall mean 'Indian Area' except where specific reference is made to the jurisdiction of the court." 24 C.F.R. § 1000.10. In turn, the regulations demonstrate that "Indian area" does not have a court jurisdiction aspect, as "Indian area" simply "means the area within which an Indian tribe operates affordable housing programs." Id. Here, it is the term "court jurisdiction" that the UKB objects to, given that it is the term used in the challenged regulation. 24 C.F.R. § 1000.302. Accordingly, the use of the term "jurisdiction" has no particular relevance to the inquiry as to whether NAHASDA unambiguously prohibits a court jurisdiction requirement.

Furthermore—even indulging the unwarranted assumption that the two terms are synonymous—rather than suggesting that § 4152 is ambiguous, the inclusion of the "jurisdiction" language in § 4112(c) demonstrates that Congress explicitly excluded court jurisdiction from the need-based formula under § 4152.[9]

_____

[9] The dissent argues that there is no formula under § 4152 because Congress delegated to HUD the responsibility to create a formula. Dissent at 4-5. This is mere wordplay. Of course, as this opinion acknowledges, HUD ultimately created the formula. However, it must do so "under" the guidance set forth in § 4152—guidance that explicitly requires a nexus between the factors and need. It

(continued...)

-18-

Because Congress demonstrated its awareness of a jurisdictional element in one section of the statute, it is clear that it could have allowed for court jurisdiction in another section of the statute if it had wished to do so. But it did not. Accordingly, the reference to jurisdiction in § 4112(c) does nothing to undermine our conclusion that § 4152 unambiguously excludes non-need-based factors such as court jurisdiction.

B.    The Formula Area Requirement Conflicts with NAHASDA's Plain Language

Having concluded that the language is unambiguous, we must next determine whether HUD's regulations conform to the clearly expressed intent of Congress. The seven criteria set forth in 24 C.F.R. § 1000.324 plainly reflect the need of Indian tribes and Indian areas. However, HUD has interposed § 1000.302 as a "precursor" or threshold requirement; if the tribe cannot show that it could exercise court jurisdiction, then it cannot claim a Formula Area or, it follows, qualify for a need-based funding allocation under the criteria of § 1000.324. As we have already suggested, we can find no discernible nexus between the requirement that the Indian tribes exercise court jurisdiction over some geographic area and the "need" of the tribes, as that term is ordinarily construed.

The requisite connection to need does not come from the alleged difficulty

---

[9](...continued)
is in that sense that there is a formula under § 4152.

-19-

of considering the needs of an Indian tribe if the tribe does not exercise court jurisdiction over a geographic area. The existence of such a difficulty is belied by the fact that the regulations already permit tribes to get funding solely because they provide substantial housing services, regardless of whether they exercise court jurisdiction. In order to see this, we must engage in a hypothetical. Assume that, while the applicant tribe (which we shall call Tribe A) can claim no court jurisdiction of its own, it provides substantial housing services in an area that falls outside the court jurisdiction of the nearest tribe (Tribe B). In that situation, under the existing regulations, Tribe A could get federal funding without having to show court jurisdiction at all. The regulations only require court jurisdiction *or* provision of substantial housing services and, where applicable, a Memorandum of Agreement with the governing tribe. 24 C.F.R. § 1000.302. If, as in our hypothetical, Tribe A's housing is located outside the court jurisdiction of Tribe B and that of any other nearby tribe (relieving it of the need to secure a Memorandum of Agreement), it could secure IHBG funding *merely by showing that it provided substantial housing services.* Court jurisdiction would be irrelevant. Therefore, because the regulations themselves allow for a situation where an Indian tribe can secure funding without exercising court jurisdiction or having a Memorandum of Agreement with a tribe that does have court jurisdiction, we cannot conclude that court jurisdiction has any real

connection with the determination of "need."[10]

The dissent dismisses this rationale, and argues that the court jurisdiction requirement "supplies a necessary geographic boundary for NAHASDA funding." Dissent at 6. Again, however, the dissent assumes that "jurisdiction" is necessarily synonymous with "court jurisdiction." Because these two terms are not synonymous, it is not far-fetched to think, as the dissent seems to say, that the Indian tribe could provide housing assistance outside its own court jurisdiction but within its purview such that it could be claimed in the Indian Housing Plan submitted to HUD. For instance, a tribe might construct low-income housing on land that it owns but that does not qualify as Indian country. See Narragansett Indian Tribe, 89 F.3d at 910-11 (stating that the Narragansett Indian Tribe was constructing a housing complex on land that did not qualify as Indian country). In that situation, the housing would be within the tribe's "Indian area" and could be claimed even though it was not within its court jurisdiction. Again, this

---

[10] For much the same reason, we conclude that the court jurisdiction requirement is not saved by § 4152(c). Congress specified two other factors, in addition to the "need-based" factors of § 4152(b), that HUD must consider. Id. § 4152(c). However, those factors are not applicable to this case. While one of the factors refers to the "relative administrative capacities" of the recipient, we do not see how the court jurisdiction requirement relates to a tribe's administrative capacity. The regulations themselves seem to suggest that court jurisdiction is not a particularly important administrative consideration, given that they allow for Indian tribes get federal funding without any court jurisdiction in the circumstances outlined above. In any event, HUD made no real argument as to the relation between "administrative capacity" and court jurisdiction.

-21-

demonstrates the absence of a nexus between court jurisdiction and need.[11]

The absence of such a connection means that HUD's imposition of the §
1000.302 Formula Area court jurisdiction requirement as a threshold for need-
based funding over the minimum allocation is contrary to Congress's plainly
expressed intent because it leads to funding allocations based on factors that do
not reflect tribal housing needs. This conclusion finds no better illustration than
the case at hand: the UKB's need for housing assistance did not abate when HUD
concluded that the UKB lacked the ability to claim court jurisdiction.

In sum, because NAHASDA is clear that the funding formula must be based
exclusively on factors reflecting tribal need for housing assistance, Chevron
deference does not apply to 24 C.F.R. § 1000.302—at least insofar as its court
jurisdiction requirement functions as a threshold that must be met before need-
based funding can be secured under § 1000.324. See Chevron, 467 U.S. at 842-43
("If the intent of Congress is clear, that is the end of the matter; for the court, as
well as the agency, must give effect to the unambiguously expressed intent of
Congress."). "[T]he principle that accords substantial weight to interpretation of

---

[11] Moreover, we note that adopting the dissent's position would do nothing
to create a usable geographic boundary for calculating need. The dissent asserts
that "*at least part* of an Indian tribe's 'Indian area' . . . must include the tribe's
jurisdiction." Dissent at 8-9 (emphasis added). Having conceded that a tribe's
"Indian area" might not be identical to its court jurisdiction, the dissent must also
concede that the court jurisdiction requirement does not "identify what
geographic boundaries would be used in determining where an Indian tribe can
provide housing assistance" as the dissent claims it does. Dissent at 6.

a statute by the department entrusted with its administration is inapplicable insofar as those regulations are inconsistent with the [statute]." Townsend v. Swank, 404 U.S. 282, 286 (1971). This is so because the "judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron, 467 U.S. at 843 n.9. Accordingly, because the use of § 1000.302 as a threshold requirement conflicts with the plain language of 25 U.S.C. § 4152(b), we must conclude that it is invalid under the APA and that its application in the final agency action before us renders that action fatally flawed.[12] 5 U.S.C. § 706(2)(A) (stating that courts are to set aside agency actions that are "not in accordance with law"). The fact that the regulatory scheme was developed through a negotiated rulemaking procedure is of no relevance to this determination.

II.    Procedural Issues

The UKB also contends that HUD acted arbitrarily and capriciously in its handling of the CNO's challenge to HUD's decision to allocate funds to the UKB. We have previously stated that "[w]e will . . . set aside an agency action if the agency has failed to follow required procedures." Citizens' Comm. to Save Our

---

[12] Having found NAHASDA to be unambiguous, we need not reach the UKB's argument that Chevron deference does not apply because of the rule of statutory construction, set forth in Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985), that federal statutes are to be construed liberally in favor of Indians.

Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008); see Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994).  The UKB argues that HUD failed to follow its own procedures by entertaining the CNO's challenge because it had established no procedures for hearing legal challenges by third party tribes.  The UKB also argues that even if HUD could hear the challenge in the first instance, it could not then permit an appeal by the CNO in the absence of a regulation granting a right to appeal.

We also have grave concerns with the fact that the CNO was permitted to appeal when there was no regulation granting it the right to do so.  The regulations only permitted third-party Indian tribes to raise challenges to "data contained in the U.S. Decennial Census" and bring appeals related to those challenges—and this certainly was not a challenge to census data.  See 24 C.F.R. § 1000.336.[13]  However, having resolved the statutory interpretation issue in favor of the UKB, and having determined that the use of 24 C.F.R. § 1000.302 as a threshold requirement is invalid, we need not resolve the procedural issues.

Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.  The motion to supplement the record on appeal and the supplemental motion to supplement the record on appeal are DENIED.

_____

[13] Notably, 24 C.F.R. § 1000.336 was amended in 2007 so that tribes may now challenge data used in determinations regarding the Formula Area.  The regulations that existed at the time only referred to census data challenges.

08-7025, United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. & Urban Dev.

**BRISCOE, J.**, Circuit Judge, dissenting.

I respectfully dissent. While I agree that the "main issue before us is whether NAHASDA is clear and unambiguous such that we should not grant Chevron deference to the implementing regulations," Maj. Op. at 8, I read NAHASDA as a whole to be ambiguous in its references to tribal jurisdiction when addressing requirements a tribe must satisfy in order to receive funding. Accordingly, I would apply Chevron deference and consider HUD's regulations and their present application. Based on this analysis, I would affirm.

I

The majority's statutory construction analysis begins and ends with the plain language of 25 U.S.C. § 4152(b). Maj. Op. at 13 ("Section 4152(b) states that 'the formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities.' This language explicitly and unambiguously mandates that the factors in HUD's allocation formula reflect . . . the need of Indian tribes and Indian areas of the tribes.") (citation omitted). In my view, this approach ignores an important canon of statutory construction. Following the guidance of the Supreme Court, this Circuit has repeatedly noted the need to consider statutory language in the "broader context of the statute as a whole." E.g., In re Wise, 346 F.3d 1239, 1241 (10th Cir. 2003) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341

(1997) for the statement, "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1143 (10th Cir. 2005) (citing United States v. Nichols, 184 F.3d 1169, 1171 (10th Cir. 1999) for the assertion that "appellate courts must examine the . . . language in context, not in isolation"); Wyoming v. United States, 279 F.3d 1214, 1230 (10th Cir. 2002) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 99 (1992) for the statement, "We must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law."); Osborne v. Babbitt, 61 F.3d 810, 812 (10th Cir. 1995) ("In determining the meaning of a statute, we look at not only the statute itself but also at the larger statutory context.").  To examine § 4152(b)'s need requirement in the broader context of NAHASDA as a whole, it is necessary to review the NAHASDA framework.

Under the NAHASDA framework, Congress delegated to HUD authority to make housing grants "on behalf of Indian tribes to carry out affordable housing activities."  25 U.S.C. § 4111(a).  HUD may make a grant under NAHASDA only if the Indian tribe submits a qualifying "Indian housing plan for such fiscal year." Id. § 4111(b)(1)(A)–(B).  Every housing plan an Indian tribe submits to HUD "shall contain" "a general statement of the mission of the Indian tribe to serve the needs of the low-income families in the jurisdiction of the Indian tribe during the

-2-

period[,]" "a statement of the goals and objectives of the Indian tribe to enable the tribe to serve the needs [of the low-income families in the jurisdiction of the Indian tribe]" and "a statement of the housing needs of the low-income Indian families residing in the jurisdiction of the Indian tribe and the means by which such needs will be addressed during the period, including . . . a description of the estimated housing needs and the need for assistance for the low-income Indian families in the jurisdiction . . . and . . . a description of the estimated housing needs for all Indian families in the jurisdiction." 25 U.S.C. § 4112(b)(1)–(2), (c)(2)(A)–(B) (emphasis added).[1] Upon receiving the plans, "[HUD] shall conduct a limited review of each Indian housing plan submitted to [HUD] to ensure that the plan complies with the requirements of section 4112 . . . . [HUD] shall have the discretion to review a plan only to the extent that [HUD] considers review is necessary." 25 U.S.C. § 4113(a)(1). For "Indian tribes that comply

---

[1] I note that the majority's description of the NAHASDA framework and the required housing plans states only, "NAHASDA established a housing-assistance program that was funded directly through Indian Housing Block Grants . . . and disbursed to tribes on the basis of Indian Housing Plans prepared by the tribes and submitted to HUD." Maj. Op. at 3 (citation omitted). The majority also cites Fort Peck Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev., 435 F. Supp. 2d 1125, 1127–29 (D. Colo. 2006) for a general description of NAHASDA's funding mechanism. The description in Fort Peck, however, includes the requirement of a statement describing a tribe's jurisdiction. 435 F. Supp. 2d at 1128 ("NAHASDA provides that HUD shall make grants on behalf of Indian tribes to carry out affordable housing activities for each fiscal year from an appropriation for that year for tribes that have submitted an Indian housing plan, meeting general statutory requirements, including a statement of needs of low-income Indian families residing in the jurisdiction of the tribes.").

with the requirements under [NAHASDA] for a grant under [NAHASDA]," HUD

allocates funding "in accordance with the formula established pursuant to section

4152 . . ." 25 U.S.C. § 4151.

Under this framework, before an Indian tribe can receive NAHASDA

funding, the tribe must submit a statement of the housing needs in the tribe's

jurisdiction. This requirement ties a tribe's receipt of NAHASDA funding to its

description of housing needs in the tribe's jurisdiction. At minimum, it is

ambiguous whether a tribe must have jurisdiction over an area before it can

estimate and seek funding for its housing needs.

The majority disputes this ambiguity by reasoning that "rather than

suggesting that § 4152 is ambiguous, the inclusion of the 'jurisdiction' language

in § 4112(c) demonstrates that Congress explicitly left jurisdiction out of the

need-based formula under § 4152." Maj. Op. at 18. To me, this logic is

unconvincing.[2] Simply put, Congress could not have "explicitly" left jurisdiction

_____

[2] The majority appears to concede that there is a jurisdictional element to NAHASDA funding, but emphasizes the distinction of the "court jurisdiction" language in the regulations. Thus, in addition to reading § 4152's reference to "need" to be unambiguous, the majority apparently also considers § 4112's reference to "jurisdiction" to unambiguously exclude "court jurisdiction." E.g., Maj. Op. at 17 ("[T]he reference to jurisdiction in its generic sense does nothing to suggest that HUD was free to impose a requirement of *court* jurisdiction."). I do not share the majority's certainty on this issue. See Black's Law Dictionary (8th ed. 2004) (defining jurisdiction as: "1. A government's general power to exercise authority over all persons and things within its territory . . . 2. A court's power to decide a case or issue a decree . . . ."); Maj. Op. at 12 ("We must assume
(continued...)

out of the "formula under § 4152" because Congress did not explicitly create a formula under § 4152. Indeed, to state that there is a "formula under § 4152" is itself a misnomer because there is no formula in § 4152. In § 4152, Congress delegates to HUD the responsibility to "establish a formula . . . in accordance with the requirements of this section." 25 U.S.C. § 4152(a). "The requirements of this section" identify that "[t]he formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities . . . ." Id. § 4152(b). Given this statutory language, it strains reason to conclude that a delegation of authority to create a formula based on "factors that reflect" need of the Indian areas implies that Congress explicitly omitted a jurisdiction requirement from that formula.

Similarly, the majority's rephrased conclusion—"Because Congress demonstrated its awareness of the jurisdictional element in one section of the statute, it is clear that it could have allowed for court jurisdiction in another section of the statute if it had wished to do so," Maj. Op. at 19—highlights several contradictions in the majority's analysis. First, this statement considers

---

[2](...continued)
that the ordinary meaning of the words Congress uses conveys its intent."). I am also unconvinced by the majority's citation to 24 C.F.R. § 1000.10 for the regulatory definitions of "Indian area" and "jurisdiction." Because the majority holds that NAHASDA is clear and unambiguous such that Chevron deference to HUD's regulations is inapplicable, it is contradictory to apply HUD's regulations to conclude that NAHASDA is unambiguous.

-5-

NAHASDA to be one statute, reinforcing the need to consider § 4152 in its broader context. Second, the statement acknowledges there is a jurisdictional element to NAHASDA. The holding of the majority, however, is that NAHASDA unambiguously forecloses any jurisdictional requirements in the funding formula. Third, this conclusion contradicts the language of the statute, which establishes a jurisdictional element as a necessary precondition before any funding can be allocated under § 4151, according to the formula established pursuant to § 4152. Because the jurisdictional element is a necessary precondition to applying § 4152, it arguably would be superfluous for Congress to again include the same requirement in § 4152.

The ambiguous jurisdiction requirement in § 4112 also supplies a necessary geographic boundary for NAHASDA funding. The majority does not identify what geographic boundaries would be used in determining where an Indian tribe can provide housing assistance. The majority only concedes that § 4152(b)'s need requirement relates to the "Indian areas of the tribes." Maj. Op. at 14–15. After applying the statutory definition of "Indian area," the majority determines that "all that the use of the term 'Indian area' in § 4152(b) indicates is that HUD must take into consideration the need of the area in which the applicant Indian tribe provides housing assistance . . . ." Id. at 14. Under this construction, HUD should provide housing assistance funding only for areas where Indian tribes provide housing assistance and there is need for housing assistance funding.

-6-

This approach appears circular, if not meaningless; nothing would prevent an Indian tribe from randomly expanding its "Indian area" to include areas in need wherever located.

Additionally, the majority disregards the element of the "Indian area" definition that requires the housing assistance to be provided under NAHASDA. 25 U.S.C. § 4103(10) ("The term 'Indian area' means the area within which an Indian tribe . . . provides assistance under this Act for affordable housing.") (emphasis added). To receive funds to provide assistance under NAHASDA, the tribe must comply with NAHASDA's requirements. Id. § 4151. One of NAHASDA's requirements is to submit a housing plan describing the needs, and goals to serve the needs, of the tribe's jurisdiction. Id. § 4112. Neither the majority, nor NAHASDA's plain language, suggests how a tribe would receive funding for an area outside its jurisdiction, and consequently not described in its qualifying housing plan. If a tribe does not receive funding for an area outside of its jurisdiction, then arguably it does not provide housing assistance under NAHASDA for that area. If it does not provide housing assistance under NAHASDA for that area, then that area is not within the tribe's "Indian area." Consequently, for the majority's holding—that NAHASDA's use of "Indian area" unambiguously does not include a jurisdictional element—to be tenable, one must assume, without a statutory basis, that HUD provides funding for areas that are not required to be described in a tribe's qualifying housing plan.

On the other hand, because § 4112 requires a tribe to describe its housing needs in its jurisdiction and also requires a tribe to describe how it will address those needs in its jurisdiction, it is reasonable to assume that the Indian tribe must provide housing assistance in its jurisdiction.[3] Consequently, at least part of an Indian tribe's "Indian area"—defined to be "the area within which an Indian tribe . . . provides assistance under [NAHASDA] for affordable housing," 25 U.S.C. § 4103(10)—must include the tribe's jurisdiction.[4] Because § 4152 requires the allocation formula to be based on factors that reflect "the need . . . of the Indian areas of the tribes," the allocation formula is ambiguous about whether that need must be within an Indian tribe's jurisdiction. At a minimum, § 4112's repeated references to need within a tribe's jurisdiction directly refutes the majority's assertion that "we can find no discernible nexus between the requirement that the Indian tribes exercise court jurisdiction over some geographic area and the 'need'

_____

[3] This statutory requirement also makes the majority's hypothetical scenario under the regulations irrelevant and likely impossible. See Maj.Op. at 20. The majority postulates the existence of a "Tribe A" that "can claim no court jurisdiction of its own" but "provides substantial housing services" and "could get federal funding without having to show court jurisdiction at all." Id. The majority fails to explain how Tribe A can submit a qualifying Indian housing plan under § 4112 that describes the low-income families and the housing needs of its non-existent jurisdiction. If Tribe A cannot submit such a housing plan, it would be ineligible for NAHASDA funding under 25 U.S.C. § 4111(b)(1)(A)–(B).

[4] Under the plain language of the statute, it is conceivable that a tribe's Indian area and its jurisdiction would not be identical. If a tribe did not provide housing assistance to a portion of its jurisdiction, then that portion of its jurisdiction would not be within its Indian area.

-8-

of the tribes . . . ." Maj. Op. at 19.

Ultimately, NAHASDA's plain language requires a description of the needs of the tribes' jurisdictions in their submitted housing plans and consideration of factors reflecting the need of the Indian areas under its allocation formula. In my view, this situation is similar to <u>Kansas v. United States</u>, 249 F.3d 1213 (10th Cir. 2001). In <u>Kansas</u>, we reviewed a statute that defined "Indian lands" as "any lands . . . over which an Indian tribe exercises governmental power," but separately required the tribe to exercise jurisdiction. <u>Kansas</u>, 249 F.3d at 1228 (citing 25 U.S.C. § 2703(4)(B), 2710(b)(1)). When reviewing the agency's decision in <u>Kansas</u>, we addressed the distinction between governmental power over land and jurisdiction over land. <u>Id.</u> at 1229. We stated, "We agree . . . that before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land."[5] <u>Id.</u> By requiring jurisdiction in some parts of the statute, but not including jurisdiction as part of the "Indian areas" definition, I similarly view NAHASDA as ambiguous regarding whether its jurisdictional references require a tribe to exercise jurisdiction over land before it can receive funding for housing assistance. <u>See</u>

---

[5] I note that the majority also cites this statement, Maj. Op. at 11 n.5, but still concludes there is no connection between jurisdiction and a tribe's ability to provide housing assistance in its Indian area. Apparently, the majority does not consider providing housing assistance to be a governmental function requiring the exercise of governmental power.

id. (noting that the statute at issue "shed[] little light on the question" and finding that "Congress ha[d] not directly spoken to the precise question at issue") (quotation omitted).  Because I consider NAHASDA to be ambiguous on this issue, I would apply <u>Chevron</u> deference to HUD's statutory interpretations.[6]

II

A. HUD's interpretation of NAHASDA

Having determined that NAHASDA is ambiguous regarding whether a tribe's jurisdiction is a consideration for IHBG funding, I next would consider whether HUD's interpretation is permissible.  <u>Wedelstedt v. Wiley</u>, 477 F.3d 1160, 1165 (10th Cir. 2007) ("If the statutory scheme involves an ambiguity or silence on the precise question at issue, however, we must next consider whether

---

[6] I would also reject the UKB's alternative argument that "[e]ven if NAHASDA were ambiguous . . . [w]hen Indian interests are involved, <u>Chevron</u> does not apply."  Aplt. Br. at 10.  I agree that in cases reviewing statutes intended to benefit Native Americans, "the canon of [statutory] construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes."  <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d 1455, 1462 (10th Cir. 1997).  I would not, however, apply this canon of statutory construction in this context for two reasons.  First, I do not concede the UKB's contention that requiring a tribe to exercise jurisdiction is detrimental to a tribe's interests in providing housing services.  Second, the canon of statutory construction favoring Native Americans is inapplicable when either reading of the statute would benefit Native Americans.  <u>Utah v. Babbitt</u>, 53 F.3d 1145, 1150 (10th Cir. 1995) ("We find this canon inapplicable here because the interests at stake both involve Native Americans.").  Funding under NAHASDA is a finite amount, fixed annually.  Each eligible tribe receives its funding as a portion of the available funding.  Under this framework, there are Native American interests on both sides of the question of whether the statute ambiguously requires a tribe to exercise jurisdiction over land to be eligible for IHBG funding.

-10-

the agency's interpretation is permissible."). "If Congress has explicitly or implicitly delegated authority to an agency, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Nutraceutical Corp. v. Von Eschenbach, 459 F.3d 1033, 1038 (10th Cir. 2006) (quotation omitted); Newton v. F.A.A., 457 F.3d 1133, 1136 (10th Cir. 2006) ("[W]e ordinarily defer to an agency's interpretation of an ambiguous statute that it implements.").

HUD's application of the regulations at issue, 24 C.F.R. § 1000.302 and 1000.324, considers a tribe's ability to exercise jurisdiction over an area as part of the IHBG funding formula. As addressed above, I view NAHASDA's inclusion of references to tribal jurisdiction in the funding formula as ambiguous. NAHASDA delegates to HUD to create other relevant factors for the IHBG funding formula. 25 U.S.C. § 4152(b)(3) ("Other objectively measurable conditions as the Secretary and the Indian tribes may specify."). By identifying a formula area as limited by a tribe's jurisdiction, the formula area is objectively measurable and is relevant to other portions of the statute that require "Indian areas." 25 U.S.C. § 4103(10). In my view, HUD's regulation requiring the tribe to have jurisdiction over an area is a permissible addition, if not a necessary starting point, in identifying a tribe's housing needs and meeting the statutory requirement of providing housing assistance. Because HUD's construction of the statute is permissible, I would defer to its interpretation.

-11-

B.     HUD's Action

Because I would defer to HUD's interpretation of NAHASDA, I also would consider HUD's actions under its regulations. Review of HUD's final agency action is controlled by the APA, which states in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

5 U.S.C. § 706(2)(A); see Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1271 (10th Cir. 2007) (applying this standard). Under the arbitrary and capricious standard of review, "review is narrow and deferential; we must uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors." Nutraceutical Corp., 459 F.3d at 1038 (quotation omitted).

1.     HUD's interpretation of its regulations

The UKB argues that HUD acted arbitrarily and capriciously. First, the UKB contends that HUD's interpretation of its regulations to include a jurisdictional requirement in the funding formula contradicts the clear language of NAHASDA and HUD's regulations. I disagree. Because Chevron is applicable and I would defer to HUD's permissible interpretation of NAHASDA, I also would give substantial deference to HUD's interpretation of its own regulations.

-12-

See Leavitt, 509 F.3d at 1272 ("[W]e must give substantial deference to an agency's interpretation of its own regulations.") (quotation omitted).

The UKB contends that the "plain language of NAHASDA and its implementing regulations do not require the designation of a formula area and the exercise of jurisdiction over a geographic area . . . ." Aplt. Br. at 15 (emphasis omitted). Because I would conclude that NAHASDA is ambiguous on this issue, I would confine my present review to HUD's regulations. Under 24 C.F.R. § 1000.310, "[t]he IHBG formula consists of two components: (a) Formula Current Assisted Housing Stock (FCAS); and (b) Need." Both parties agree that only the need component is presently at issue. The need component consists of seven criteria addressing households in need. 24 C.F.R. § 1000.324. Absent from these criteria is a fixed boundary within which one could determine the number of households that satisfy the need criteria. I consider HUD's reference to the "formula area" definition found in 24 C.F.R. § 1000.302 to be appropriate, and likely necessary, to calculate the number of relevant households. I would defer to HUD's interpretation of its regulations to read "formula area" in 24 C.F.R. § 1000.302 as the area relevant for the formula tabulations.

2.     Similarly-Situated Tribes

The UKB also contends that HUD's action is arbitrary and capricious because it treats similarly-situated tribes differently. To support this argument, the UKB contends:

-13-

In the same year that HUD denied IHBG funding to the [UKB] . . . , HUD granted funding to the Pamunkey Tribe, the Lumbee Tribe, the Poospatuck Indians and the Waccamaw Siouan State Tribe. (Aplt. App['x] []229). These state tribal entities lack the legal capacity to exercise jurisdiction over land and are not qualified to have lands held in trust by the federal government.

Aplt. Br. at 18–19. The UKB also highlights HUD's acknowledgment of the possibility of similar tribes—"since there may be other landless tribes, we need to understand the implications of any decision that is made in this case on other tribes"—and contends that because the record does not otherwise consider the implications of its decision on other tribes, HUD ignored this aspect of the analysis. Id. at 19 (quoting Aplt. App'x at 72).

The record citation provided by the UKB to support the existence of similarly-situated tribes refers only to a letter through counsel from the UKB to HUD disputing UKB's jurisdiction over a formula area. Assuming that this is appropriate authority, I would read the letter to state that HUD provided IHBG need funding to the referenced tribes because they met the formula area definition under 24 C.F.R. § 1000.302(viii). Aplt. App'x at 229. To the extent the UKB did not meet the formula area definition, the referenced tribes are not similarly situated.

I also would reject the UKB's contention that HUD failed to consider the impact on other similar tribes. As the UKB noted, HUD acknowledged the potential impact on other similar tribes as a consideration. HUD later indicated

-14-

that the UKB was not the only tribe affected by the Cherokee Nation's contention that only it could exercise jurisdiction over the Cherokee Oklahoma Tribal Statistical Area. Id. at 172. HUD identified the similarly-affected tribes as "the Shawnee Tribe . . . and Delaware Tribe of Indians." Id. According to HUD, the Delaware Tribe lost its federal recognition and was no longer eligible for IHBG funding, and the Shawnee Tribe did not appeal the decision. Id. at 172–73. In its letter to HUD, the UKB acknowledged that "[t]his situation is unique to these two tribes [the UKB and the Cherokee Nation] because they both are successors in interest to the former Cherokee Nation." Id. at 234. Based upon these considerations, which HUD identified as a part of its decision-making process, I cannot conclude that HUD ignored or disregarded the implications of its UKB decision on other tribes.

3.    HUD's consideration of the Cherokee Nation's Challenge

Under 24 C.F.R. § 1000.336(a), "An Indian tribe . . . may challenge data used in the IHBG formula." Because the regulations do not provide explicitly for a third party to challenge a tribe's IHBG funding, the UKB contends HUD acted arbitrarily and capriciously by acting on the Cherokee Nation's letter that requested a review of the formula area for other tribes in the Cherokee Nation's jurisdictional area.

The majority expresses "grave concerns" that HUD permitted the Cherokee Nation to appeal absent an explicit regulation. Maj. Op. at 24. I do not share

-15-

these concerns. HUD considered the Cherokee Nation's letter to be a challenge under 24 C.F.R. § 1000.336. Aplt. App'x at 25. As before, I would give substantial deference to HUD's interpretation of its own regulations. Although the regulation does not reference explicitly the ability of one tribe to challenge the existence of another tribe's formula area, this omission is similar to the absence of a formula area factor in the need formula in 24 C.F.R. § 1000.324. Just as the identification of the number of relevant households must necessarily be bound by a geographic boundary, census data relevant to those same households under the same need formula must also be confined by a geographic boundary. Despite the majority's view that "this certainly was not a challenge to census data," Maj. Op. at 24, I would consider a challenge to the location or existence of such boundaries as a challenge to the number of people within those boundaries. In this regard, the Cherokee Nation's letter challenged data used in the IHBG formula. Accordingly, I would defer to HUD's application of 24 C.F.R. § 1000.336.

Relatedly, the UKB challenges HUD's consideration of the Cherokee Nation's appeal of HUD's decision that the UKB satisfied the formula area requirement. The letter notifying the Cherokee Nation of this decision stated, "In accordance with 24 C.F.R. § 1000.336(b)(1) and 1000.118, you have the right to appeal this decision." Aplt. App'x at 173. Section 1000.336(b)(1) provides in pertinent part:

In the event HUD challenges the validity of the submitted data, the Indian tribe . . . and HUD shall attempt in good faith to resolve any discrepancies so that such data may be included in formula allocation. Should the Indian tribe . . . and HUD be unable to resolve any discrepancy by the date of formula allocation, the dispute shall be carried forward to the next funding year and resolved in accordance with the dispute resolution procedures set forth in this part for model housing activities (§ 1000.118).

Section 1000.118 provides in pertinent part: "(a) Within thirty calendar days of receiving HUD's denial of a proposal to provide assistance to non low-income Indian families or a model housing activity, the recipient may request reconsideration of the denial in writing. The request shall set forth justification for the reconsideration."

The UKB contends that neither of these sections provides for "third party" appeals. Aplt. Br. at 22. Moreover, the UKB asserts that the Cherokee Nation did not file its appeal within the required thirty days. I would reject both arguments. HUD instructed the Cherokee Nation of its right to appeal under the cited regulations. Having concluded that HUD appropriately considered the Cherokee Nation's letter as a challenge under § 1000.336, it would be illogical to conclude that the Cherokee Nation could not appeal an adverse determination under the same regulation. Further, I note that no relevant language in § 1000.336 limits who may bring a challenge or appeal beyond "An Indian tribe." 24 C.F.R. § 1000.336(a), (b)(1). This regulation does not exclude third-party appeals or challenges by an Indian tribe, such as the Cherokee Nation. Regarding

-17-

the thirty-day limit, HUD sent a letter notifying the Cherokee Nation of its right to appeal on October 18, 2005. Aplt. App'x at 172. The Cherokee Nation filed its appeal on November 16, 2005. Id. at 174. Consequently, I would conclude that the Cherokee Nation appealed "[w]ithin thirty calendar days of receiving HUD's denial," satisfying 24 C.F.R. § 1000.118(a).

4.     Nine years of precedent

The UKB raises several arguments based on the premise that HUD arbitrarily and capriciously disregarded nine years of precedent for providing the UKB IHBG funding. In my view, the UKB's arguments disregard the explicit statutory language of NAHASDA. NAHASDA requires "an Indian tribe to submit to the Secretary, for each fiscal year, a housing plan under this section." 25 U.S.C. § 4112(a)(1)(A). NAHASDA requires HUD to "conduct a limited review of each Indian housing plan." 25 U.S.C. § 4113(a)(1). NAHASDA instructs HUD to "establish a formula to provide for allocating amounts available for a fiscal year for block grants." 25 U.S.C. § 4152(a). By requiring annual submission and review of housing plans before allocating funding, the terms of NAHASDA necessarily reject the UKB's reliance on nine years of prior funding as precedent for continued funding.

5.     The UKB's jurisdiction over lands within the former Cherokee reservation

Alternatively, the UKB asserts that HUD acted arbitrarily and capriciously by failing to consider that the UKB exercises jurisdiction over lands within the

-18-

former Cherokee reservation. To support this argument, the UKB cites sources outside of the administrative record. I cannot conclude that HUD acted arbitrarily and capriciously because it failed to consider evidence that was not before it.[7] See Am. Mining Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985) ("[T]he agency's action must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted.").

6.      Availability of Alternative Funding

The UKB argues that HUD acted arbitrarily and capriciously by failing to consider whether the designation of additional formula areas would be fair and equitable under 24 C.F.R. § 1000.302(2). The UKB's entire argument on this issue is as follows: "In the present case, the administrative record establishes that HUD failed to consider IHBG funding in the [UKB]'s proposed Formula Area as under 24 C.F.R. § 1000.302(2). Accordingly, HUD's denial was arbitrary and capricious." Aplt. Br. at 28. The UKB fails to clarify what HUD failed to consider in the UKB's Formula Response Form. In the absence of that clarification, I cannot conclude that HUD's action was arbitrary and capricious.

---

[7] The evidence that the UKB seeks to add to the administrative record is the affidavit of George Wickliffe, who is currently the Chief of the UKB. Aplt. App'x at 398. Mr. Wickliffe states that the UKB exercises exclusive jurisdiction over specific addresses in Oklahoma. This assertion does not indicate a factor that HUD failed to consider. To the contrary, HUD addressed whether the UKB exercised jurisdiction over lands within the former Cherokee reservation and relied on holdings from this court and letters from the BIA. Aplt. App'x at 25.

-19-

III

I would affirm.